Cato, a Slave, vs. The State.—Statement of Case.

CATO, A SLAVE, PLAINTIFF IN ERROR, VS. THE STATE.

1. It is not indispensable that the jury, in a capital case, should be committed to the charge of a bailiff specially sworn for the occasion. It is sufficient if they be put in charge of the Sheriff, or his deputy, who has taken the oath of office.

2. The "bill of exceptions" is a privilege accorded to a party, to cause that to be made a *matter of record* which would not otherwise appear in the history of the trial; he must therefore incorporate in his bill whatever *fact* he may desire to rely upon as matter of error. Unless so incorporated, the Supreme Court will not assume its existence, nor will it be induced to enter the field of mere conjecture.

3. If the Court assumes to charge the jury, it ought to charge on the whole law; but if a party desires to avail himself of any failure or omission in this respect, he must call the particular point to the attention of the Court, otherwise he will not be permitted to assign the omission for error.

4. Where a slave is indicted for the crime of rape, he cannot be convicted of a simple *assault*, the Circuit Court having no jurisdiction of that offence when committed by a *negro* or *mulatto*. Whether such conviction can be had in the case of a white man—*quære?*

5. On a trial for the crime of rape, it is not sufficient to charge the jury that "if a man have carnal knowledge of a woman *against her will*, he may be convicted." The charge should be, "*forcibly* and against her will."

6. Although in a strictly *legal* point of view, *force* may be implied from a *want of consent*, yet in common parlance such identity does not exist, and juries ought to receive their instructions on the law in language that they can understand.

This case was decided at Marianna.

Appeal from Jackson Circuit Court.

The plaintiff in error was indicted for the offence of rape,

alleged to have been committed upon Susan Leonard, was tried at the October term, 1859, convicted and sentenced to be hanged on the 16th day of December, 1859.

At the trial, Susan Leonard was introduced as a witness on behalf of the prosecution, who testified as follows:

Cato came to my house on Friday morning, about one hour and a half before day; I was confined so I could not help myself; I looked up and he had one hand on each of my arms; I told him to go and he ordered me to hush; I said, who is this, and he said it is one of Dr. Ely's black men; by this time I waked up so that I knew him; the moon was shining very bright; I told him to go away; he said "hush, hush, I tell you, or I'll kill you;" then he bore down on my shoulder and reached with his hand and got his knife, and put his hand on my forehead and bore my head back against the pillow, and drew the knife across my throat, and I was compelled to give up; was afraid if I spoke or made any noise he would kill me; he then went through with what he came to do; he had a connexion with me then; I am certain that prisoner was the man; there was no one in my house to assist me; lady in the adjoining room; this is the reason witness did not hallo out; Mrs. Alsobrook lived in next room, only a partition between; saw Cato's eye by moonshine; room a small bed-room; room next to the road was mine; window five or six feet from the bed; never saw Cato at that house before.

Sarah A. Alsobrook, also sworn for the prosecution, testified that she knows the negro named Cato; identified the prisoner; knows Susan Leonard; I know that some person went there, but cannot say who; he was in the house and on the bed; looked like a negro; saw through the crack; heard Mrs. Leonard say, Lord-a-mercy, is this you Cato? he heard me coming and jumped off the window; about one and a half hours before day; on Friday night before day; this year; last summer past; before last Court; a light moon-

shiney night; lived in a house over the bridge; Mrs. Leonard said she was almost willing to swear it was Cato; I have seen Mrs. Leonard and Cato speak when he was about the house; I believe, to my certain knowledge, it was a negro; his head looked mighty kinky; he said it was one of Mr. Ely's negroes; he said it was Bill who lived at the hotel; he said something about coffee or flour; she told him there was a white man there and she would call him; he told her to hush or he would kill her; heard no scuffling; was close to the parties; she did not cry out; if she had I could have heard her.

For the defence there were twelve witnesses, who testified that both the witnesses for the prosecution were common prostitutes.

There being no other evidence, the Court below charged the jury as follows, viz:

"Cato, a slave, has been solemnly arraigned at the bar of this Court upon the charge of committing a rape upon the body of Susan Leonard. He plead to the indictment in which his offence is alleged against him that he is not guilty, and you have been sworn and empannelled as a jury of the country to determine the question of his guilt or innocence. It is a solemn duty which now devolves upon you. It is a grave and important task which now demands your labors. You now hold in your hands, under God and the laws of the country, the issue of life and death, and you will not fail seriously to contemplate the grave and momentous consequences which will result from the verdict which you shall render in this case. Upon the one hand, if the laws of the land have been violated by the perpetration of a crime of a horrible and revolting character, and it has been proven to your satisfaction, by the evidence submitted, that the prisoner at the bar is the guilty person, then the commonwealth demands his conviction. But, upon the other hand, if it is not proven to your satisfaction that he is guilty, then the

law and justice both concur in the demand for his acquittal. It is true that the prisoner is of the African race and a slave, but, so far as this trial is concerned, he has the same rights as a white man. All the rules of law which would apply to a white man, if put upon his trial for the crime of rape, must apply in this case. The laws of this State affix the death penalty to the crime of rape, whether it be committed by a freeman or a slave, and the evidence which has been placed before you has been brought to the test of the same legal principles and submitted to you under the same rules of evidence as would be invoked and applied if a white man were upon his trial.

"As the crime with which the prisoner is charged is that of rape, it is appropriate and necessary that I should instruct you as to what is in law material and essential to constitute the offence. Rape is where a man has carnal knowledge of a woman by force and against her will. It will be seen from this, that although a man may have unlawful carnal knowledge of a woman, if it be with the consent of the woman, it will not constitute the crime of rape. If, however, a woman yields through fear of death, or some great bodily harm or distress, it will be rape. And even if the woman at first consented, if the offence were afterward committed against her will, it would be rape; and if the offence were committed against her will, although she consented after the fact, it would be rape. And if a man have carnal knowledge of a woman against her will, although she be a common strumpet or a common prostitute, it will be rape, just as much as if the offence had been committed upon the purest and most virtuous woman in the world.

"Now, gentlemen of the jury, if you are satisfied from the evidence that the prisoner did have carnal knowledge of Susan Leonard against her will, and that he had sexual intercourse with her and accomplished his purpose against her will, then you must find him guilty. If you are satisfied

from the evidence in this case that Susan Leonard yielded to the sexual intercourse and to the carnal knowledge through fear of death from the threats of the prisoner, then you must find him guilty. If you are satisfied from the evidence that the prisoner had carnal knowledge of her against her will by overpowering force, then you must find him guilty. Even if you are satisfied that Susan Leonard was a common prostitute, still, if you believe from the evidence that the prisoner did have carnal knowledge of her against her will, then you must find him guilty.

"In prosecutions of this character it is allowed the defendant to prove that the prosecutrix is a common strumpet or a common prostitute. This is a fact which is permitted to go to the jury for what it is worth, to indicate the improbability of a woman of such character withholding her consent to the carnal knowledge of a man. To this extent it goes to her credibility; but it is for the jury, after all, to look to the testimony to see whether the statements of the prosecutrix are true, either in whole or in part. If, upon a fair and impartial survey of all the evidence, you are satisfied that she has stated the truth, you are at liberty to believe her. You are to weigh the testimony carefully, and the law constitutes you the exclusive judges of the facts of the case, and it is your province and your duty to determine, not only as to the effect which should be given to the whole evidence, but also as to the credit to which any and all the witnesses are entitled. If, after this careful consideration of the testimony and the witnesses which have testified, you should come to the conclusion that the prisoner did have carnal knowledge of Susan Leonard, and against her will, then you must find him guilty. You must, in order to a conviction, be satisfied from the evidence that the carnal knowledge was had by a man of the woman Susan Leonard, against her will; and you must also be satisfied from the evidence that the prisoner was the man who committed the crime.

168 ·SUPREME COURT.

Cato, a Slave, vs. The State.—Statement of Case.

If the evidence in this case fall short of fixing upon your minds the moral conviction, beyond a reasonable doubt, of the existence of the two facts, that the crime was committed and that Cato was the man who committed it, then you must acquit him. But, if these two facts are clearly made out to your satisfaction by the evidence in the case, then it would be your duty to find him guilty. You cannot be too deeply or too profoundly impressed with the deep solemnity of the duty which you have to perform. In the discharge of this duty you will be calm, dispassionate, impartial and just. You will so discharge this duty, in such a manner, as shall afford protection to innocence and visit guilt with punishment. You will give the prisoner the same fair and impartial trial that you would award to a freeman.

"I now commit the case to you, gentlemen of the jury, with the confident belief that you will discharge your duty fully, fairly, impartially and with firmness and fearlessness. You are to take the case into the jury-room, where all the world is to be shut out, and in your retirement you are to ignore all extraneous circumstances, facts and influences, and you are to determine from the evidence itself, and from nothing else, whether the prisoner is guilty or innocent, after which you will return into Court and make the fact known by your sworn and solemn verdict. If, after a full view of all the testimony and a fair and patient consideration of the same, you have upon your minds a reasonable doubt of the guilt of the prisoner, such a doubt must enure to his acquittal.

"I now dismiss you to your room, gentlemen of the jury, with the sincere hope that you may be guided to a correct and just conclusion as to the question of the prisoner's guilt or innocence."

The jury retired under the charge of the Sheriff, James Griffin, and his Deputy, Henry O. Bassett, who were never sworn to take charge of said jury, but the one James Griffin

had been sworn in as Sheriff and Henry O. Bassett as the Deputy Sheriff of said James Griffin, and after considering of their verdict, returned into Court and rendered a verdict of "*guilty*."

On the 22d day of October the prisoner was led to the bar, and his attorney moved the Court for a new trial, on the following grounds:

First. That the Court erred in charging, that if it has been proved to your satisfaction by the evidence submitted that the prisoner at the bar is the guilty person, then the commonwealth demands his conviction; but, on the other hand, if it is not proven to your satisfaction that he is guilty, then the law and justice concur in the demand for his acquittal.

Second. In charging, that if a man have carnal knowledge of a woman against her will, although she be a common strumpet or a common prostitute, it will be rape just as much as if the offence had been committed upon the purest and most virtuous woman in the world. Now, gentlemen of the jury, if you are satisfied from the evidence that the prisoner did have carnal knowledge of Susan Leonard against her will, and that he had sexual intercourse with her and accomplished his purpose against her will, then you must find him guilty.

Third. In charging, that even if you are satisfied that Susan Leonard was a common prostitute, still, if you believe from the evidence that the prisoner did have carnal knowledge of her against her will, then you must find him guilty.

Fourth. In charging, that if, after the careful consideration of the testimony and the witnesses which have testified, you shall come to the conclusion that the prisoner did have carnal knowledge of Susan Leonard, and against her will, then you must find him guilty.

Fifth. That the Court erred in not charging the jury, in
20

170 SUPREME COURT.

Cato, a Slave, vs. The State.—Statement of Case.

an indictment for rape, that they might find the prisoner guilty of an assault.

Sixth. That the special venire under which the jury were summoned was issued and executed illegally in this, that the Clerk issued a special venire for fifty good and lawful men without naming them or drawing their names from a box, and the Sheriff thereupon summoned fifty men, writing their names upon a blank sheet of paper, which is returned to the Clerk and the names so furnished by the Sheriff were then entered by the Clerk in the blank of the venire, and the Sheriff then endorsed on the back of the venire that he has summoned the within named persons as jurors, such being the usual practice in this Circuit.

Seventh. That the jury who found the verdict against the prisoner were not under the charge of a sworn Bailiff, but under the charge of the Sheriff and his Deputy, who had not been sworn as Bailiffs, but had been sworn as Sheriff and as Deputy.

Eighth. That the Court erred in this, that Susan Leonard, the State's witness and prosecutrix, testified, on cross-examination, that men visited her house, but that they had no connection with her. Prisoner's counsel introduced Benjamin Stephens, and asked him if he had not had connection with Susan Leonard both before and since the prisoner was charged with rape upon her. This question the Court ruled out and refused to permit said Stephens to testify in regard to the matter of his connection with her. Prisoner's counsel asked Susan Leonard, the State's witness and prosecutrix, if she had not had connection with Benjamin Stephens. This question the Court overruled.

Ninth. That the verdict of the jury was against law and evidence.

The Court overruled the motion for a new trial, to all of which rulings the defendant, by his counsel, excepted.

*Milton* and *McClellan* for plaintiff in error.

*W. D. Barnes* for Attorney General for the State.

DuPONT, C. J., delivered the opinion of the Court.

Cato, a slave, was indicted in the Circuit Court of Jackson county upon the charge of having committed a rape upon the body of Susan Leonard. At the October term, 1859, he was arraigned, tried, convicted and sentenced to be hanged on the 16th day of December thereafter. Previous, however, to the passing of sentence by the Court, the prisoner's counsel moved for a new trial upon the following grounds, viz.:

"1st. That the Court erred in charging that if it has been proven to your satisfaction, by the evidence submitted, that the prisoner at the bar is the guilty person, then the Commonwealth demands his conviction; but on the other hand, if it is not proven to your satisfaction that he is guilty, then the law and justice both concur in the demand for his acquittal.

"2d. In charging that if a man have carnal knowledge of a woman against her will, although she be a common strumpet or a common prostitute, it will be rape just as much as if the offence had been committed upon the purest and most virtuous woman in the world. Now, gentlemen of the jury, if you are satisfied from the evidence that the prisoner did have carnal knowledge of Susan Leonard against her will, and that he had sexual intercourse with her and accomplished his purpose against her will, then you must find him guilty.

"3d. In charging that even if you are satisfied that Susan Leonard was a common prostitute, still, if you believe from the evidence that the prisoner did have carnal knowledge of her against her will, then you must find him guilty.

"4th. In charging that, after careful consideration of the

testimony and the witnesses which have testified, you should come to the conclusion that the prisoner did have carnal knowledge of Susan Leonard, and against her will, then you must find him guilty.

"5th. That the Court erred in *not* charging the jury in an indictment for rape, that they might find the prisoner guilty of an assault.

"6th. The special venire under which the jury were summoned was issued and executed illegally in this, that the Clerk issued a special venire for fifty good and lawful men, without naming them or drawing their names from a box, and the Sheriff thereupon summoned fifty men, writing their names upon a blank sheet of paper, which is returned to the Clerk, and the names so furnished by the Sheriff were then entered by the Clerk in the blank of the venire, and the Sheriff then endorsed on the back of the venire that he had summoned the within-named persons as jurors, such being the usual practice in the Circuit.

"7th. That the jury who found the verdict against the prisoner were not under the charge of a sworn bailiff, but under the charge of the Sheriff and his deputy, who had not been sworn as bailiff, but had been sworn as Sheriff and deputy.

"8th. That the Court erred in this, that Susan Leonard, the State's witness and prosecutrix, testified, on cross-examination, that men visited her house, but that they had no connection with her. Prisoner's counsel introduced Benjamin Stephens, and asked him if he had not had connection with Susan Leonard, both before and after the prisoner was charged with rape upon her. This question the Court ruled out, and refused to permit said Stephens to testify in regard to the matter of his connection with witness; counsel asked Susan Leonard, the State's witness and prosecutrix, if she had not had connection with Benjamin Stephens. This question the Court overruled.

"9th. That the verdict of the jury was against law and evidence."

The Court refused to grant the motion for a new trial, whereupon the prisoner took his writ of error under the statute, and he now comes before this Court upon a transcript of the record of such proceedings as were had in the Court below.

The general assignment of errors is as follows:

"1st. The Court erred in its instructions to the jury.

"2d. The Court erred in *not* instructing the jury *fully* as that they might find the prisoner guilty of an assault.

"3d. There was error in the mode of summoning the special venire.

"4th. There was error in not committing the jury to the charge of a bailiff specially *sworn* to take charge of them.

"5th. The Court erred in refusing to permit a question to be asked of Benjamin Stephens in relation to his having had illicit intercourse with the prosecutrix.

"6th. The verdict was against law and evidence."

In entering upon the investigation of this case, the Court is not insensible to the magnitude of the interest involved in the result of its conclusion and the weight of responsibility that rests upon it in the discharge of the functions of a Court of review and of last resort. Hence we have given to the case that patient hearing, that careful examination, that anxious and deliberate investigation which its importance demands.

On the one hand, the record presents the fact that a most foul offence has been perpetrated—that the majesty of the law has been insulted by the commission of a most heinous and revolting crime that strikes at the very foundation of society. On the other hand, life—the life of a human being —is suspended upon the issue. It is true that the unfortunate individual who stands charged with the commission of the offence is one of an inferior caste—a slave. But it is the

crowning glory of our "peculiar institutions," that whenever life is involved, the slave stands upon as safe ground as the master. The same tribunals of justice are open to each —the same form of proceedings—the same safe guards that are extended to the one are fully and freely awarded to the other. Influenced by and impressed with these views, we now address ourselves to the consideration of the case as it is presented in the record.

We will, for the present, pass by the *first and second* errors set forth in the general assignment, which relate exclusively to the matter of the *instructions* to the jury, and proceed to consider the *third* in the series of errors complained of. That assignment refers to the mode which was adopted by the Clerk and Sheriff in executing the order of the Judge, which directed the issuing of a *special* venire, in anticipation of the trial of the prisoner. This point was earnestly pressed at the hearing, and the counsel for the prisoner commented at large and with much force and particularity upon the manner in which the law had been violated; but upon a careful scrutiny of the record, the Court is unable to discover a tittle of evidence to sustain the assignment or to support the allegations and argument of the counsel. There is nothing said *in the history* of the proceedings which took place at the trial concerning the issuing of any order for a *special venire*, or even that there was any necessity to resort to one, in order to obtain a competent jury for the trial of the prisoner. The only allusion made to the matter is to be found in one of the causes assigned in the Court below as a ground for the granting of a new trial. It is very clear that its incorporation into the motion for the new trial, gives it no verity as *a fact* transpiring in the history of the trial. If the prisoner desired to avail himself of this alleged irregularity, he should have been careful to have taken such action in relation to the matter as would have caused it to have been incorporated into the record *as*

*a fact.* The assigning it as a ground for a new trial does not so incorporate it. The fact may or may not be as is alleged in the motion, and this Court will not act upon mere presumption. This assignment is therefore dismissed, with the remark, that the same point is regularly made in the case of James O'Conner vs. The State, decided at this term of the Court, to which case reference may be had for our ruling upon the point.

The fourth error assigned refers to the failure of the Court to cause a bailiff to be specially sworn to attend and take charge of the jury while deliberating upon their verdict. It was insisted in argument that it was a fatal irregularity to allow the jury to retire under the charge of the Sheriff and his deputy, who had not been specially sworn for the occasion. The record sufficiently shows that such was a fact in the history of the trial, and the Court is therefore called on to rule upon the point as presented in the assignment. This point also arises in the case of O'Conner vs. The State, and being fully discussed and ruled in that case, it becomes unnecessary to discuss it here. It is sufficient in this case to say that the error is held not to be well assigned, and it is therefore overruled.

The fifth error assigned is in reference to the refusal of the Court to permit the witness, Benjamin Stephens, to be interrogated as to his having had an illicit intercourse with the prosecutrix. The design of the counsel for the prisoner in seeking to propound the question in the Court below was to contradict a statement of the prosecutrix, who had testified on behalf of the State, and thus to impeach her as a witness. We do not feel called upon, or even at liberty to consider this assignment, for, as in the case of the *third* assignment, it is not supported by an iota of evidence. The only mention made of it in the record is when it occurs as one of the grounds stated in the motion for the new trial. We therefore dismiss it also, without further consideration.

The "bill of exceptions" is a great privilege accorded to a party, to cause that to be made a matter of record which would not otherwise appear in the history of the trial; and it is for him, therefore, to be careful to have incorporated into his bill whatsoever *fact* he may desire to rely upon as matter of error. Unless so incorporated this Court will not assume its existence, nor will they be induced to enter the field of mere conjecture.

The sixth error assigned is, that the verdict is against the law and the evidence. We propose to consider this assignment in connection with the *first* and *second*, which were passed by, and which related exclusively to the instructions of the Judge as given to the jury.

We will consider first the complaint that the Court did not charge *fully* as to the law of the case. It is insisted, in this connection, that the Court having undertaken to charge on the law, it was its duty to have charged fully on the whole law, and that it was error in the Judge not to have instructed the jury that they were at liberty to find the prisoner guilty (under the indictment for rape) of an assault. The position is undoubtedly correct that if the Court assumes to charge at all, it ought to charge on the whole law. But it is also as well settled that if a party desires to avail himself of any failure or omission in this respect, he must call the matter to the attention of the Court by a prayer for the instruction desired, otherwise he will not be permitted to assign it as error. In this case, the record does not show that any instruction of the kind was asked for. It is too much to expect of a Judge, in the hurry and confusion of a *nisi prius* trial, that he should be able to retain in his mind every point of law that may properly bear upon the case, and hence the rule above indicated that no failure or omission to charge upon a particular point of law will be sustained as error, unless his attention be specially called to it.

In considering this assignment, we are left somewhat in

doubt whether the complaint is the failure to charge that the jury might find the prisoner guilty of an "assault with intent to commit a rape," or whether that they were at liberty to find him guilty of a simple "assault." If the former be the position intended to be assumed, then it is sufficient to say that the failure or omission so to charge can work no injury to the prisoner; for, by the statute (Thomp. Dig., 490 and 538,) *in the case of a negro*, the two offences are placed upon the same footing—they are both punishable by death. If, however, the latter be the position intended to be assumed, viz: that the jury might, under the indictment, have found the prisoner guilty of a simple assault, then there is presented for consideration a very grave question, which is not easily settled. All writers on criminal law seem to be agreed, that, as a general rule, if a party be indicted upon the charge of having committed a higher offence, he may be convicted, under the indictment for that offence, of any of the minor offences which are necessarily included in the perpetration of that higher one. Mr. Bishop, in his admirable Treatise on Criminal Law, (vol. 1, § 538,) enumerates the rule thus: "In that class of cases in which a series of offences are included, one within another, a party indicted for any one of them may be convicted of any lower one, unless, what does not often happen, the form of the allegation is such as does not properly charge the lower."

Now, it is very evident that in the crime of rape an assault is necessarily included, and, under the rule above indicated, it would seem that one indicted for the higher crime of rape might be convicted of a simple assault. But it is said that there is an exception to the rule, which limits the extent of its operation, as that there can be no conviction for a misdemeanor on an indictment for a felony, and such would seem to be the current opinion. The reason

usually assigned for this limitation to the rule is, that, anciently, one charged with a misdemeanor had certain advantages at the trial, such as to make a full defence by counsel and to have a copy of the indictment and a special jury, which were privileges not allowed to those arraigned for felony, and it was deemed to be unjust to suffer a too heavy allegation to take from a defendant any of those privileges. As these distinctions are measurably abrogated in our country, the Courts of some of the States, acting in obedience to the maxim "*Cessat ratione legis, cessat ipsa lex*," have discarded the exception to the rule, and, as a consequence, have permitted convictions for misdemeanors on indictment for felony.—1 Bishop on Criminal Law, § 544, and case cited. This rule seems to have been disregarded in some of the earlier English cases, and the distinction not to have been settled, as in the case of Rex vs. Joyner, 1 J. Kelly, 29; but in the more recent case of Regina vs. Saunders, 8 Car. & Payne, 265, reported in 34 E. C. L. Reports, 726, Gurney, B., said: "I am bound to tell you that the evidence in this case does not establish the charge contained in this indictment, as the crime was not committed against the will of the prosecutrix, as she consented, believing it to be her husband; but if you think that that was the case, and that it was a fraud upon her, and that there was not consent as to this person, you must find the prisoner guilty of an assault. *Before the passing of a very recent statute*, I should have had to direct you to find a general verdict of acquittal, but by that statute it is enacted, that in any case of felony where the crime charged shall include an assault against the person, it shall be lawful for the jury to find a verdict of guilty of assault against the person indicted, if the evidence shall warrant such finding." The statute here referred to is that of 1 Vic., c. 85, § 11.

But, whatever might have been our conclusion on the point if the party indicted had been a white person, we are

very clearly of opinion that the particular instructions referred to in the assignment would have been highly improper, as the Circuit Court has no jurisdiction of assaults committed by a negro. The jurisdiction of assaults committed by negroes is given to Justices of the Peace by statute, and the Circuit Court would have no right to render judgment on any such verdict found by a jury. The section of the statute referred to is in these words, viz: "If any negro, mulatto, bond or free, shall at any time use abusive and provoking language to, *or lift his hand* in opposition to, any person not being a negro or mulatto, he, she or they so offending shall, for every such offence, proved by the oath of the party before a Justice of the Peace of the county or corporation where such offence shall be committed, receive not exceeding thirty-nine lashes on his or her bare back, except in those cases where it shall appear to such justice that such negro or mulatto was wantonly assailed, and lifted his hand in his or her own defence." Thomp. Dig., 540, § 9.

Mr. Bishop fully supports us in this view of the matter. In his Treatise on Criminal Law (vol. 1, § 548) he says: "Want of jurisdiction in the tribunal may present an obstacle to a conviction for the less offence on an indictment for the greater. Thus in Tennessee the Circuit Court can take cognizance for murder, but not of manslaughter committed by a slave, the latter offence being, in such a case, triable only in another Court, and the consequence is that when a slave is charged in the Circuit Court with murder the verdict cannot be for manslaughter," citing Nelson vs. The State, 10 Humph., 518, and also The People vs. Abbot, 19 Wend., 192.

For these reasons we are of opinion that the Judge below very properly omitted to instruct the jury that they were at liberty to find the prisoner guilty of a simple assault, and therefore the *second* error assigned is also overruled.

This brings us to consider, lastly, the evidence in the case and the instructions of the Court based thereon. In the argument before us some exceptions were taken by the counsel for the prisoner to the remarks of the Judge below, introductory to the delivery of his charge upon the law. We have carefully examined these introductory instructions and can perceive nothing in them that affords the prisoner any reason to complain. They were happily conceived and expressed, and were well calculated to impress the minds of the jury with the solemnity of the occasion and the vital importance of the issue submitted for their determination. We think, furthermore, that the circumstances of the case imperiously demanded the caution contained in these instructions. Here was an allegation that one of the highest crimes known to the law and one the most revolting to the feelings and sentiments of society had been committed, and the evidence pointed directly to one as the perpetrator who was of a degraded caste, and who occupied a social position greatly inferior to the position occupied by those who were to pass upon his life or death.

In order to a full comprehension of the exceptions taken to the instructions upon the law, a brief condensation of the evidence given at the trial will here be necessary. Susan Leonard, the prosecutrix, testified as follows: " Cato came to my house on Friday morning, about one hour and a half before day; I was confined, so I could not help myself; I looked up and he had one hand on each of my arms; I told him to go, and he ordered me to hush; I said, who is this? and he said, it is one of Dr. Ely's black men; by this time I waked up, so that I knew him; the moon was shining very bright; I told him to go away; he said, 'hush, hush, I tell you, or I will kill you;' then he bore down on my shoulder, and reached with his hand and got his knife, and put his hand on my forehead and bore my head back on the pillow and drew the knife across my throat, and I was compelled

to give up; was afraid if I spoke or made any noise he would kill me; he then went through with what he came to do; he had a connection with me then." . . . . "I am certain that prisoner was the man." . . . . "There was no one in the house to assist me; lady in adjoining room; this is the reason witness did not halloo out." . . . . "Mrs. Alsobrook lived in next room; only a partition between." . . . . "Saw Cato's eye by moonshine; room a small bed-room; room next to road was mine; window five or six feet from the bed; never saw Cato at that house before."

Sarah A. Alsobrook testified as follows:

"Knows a negro named Cato; identified the prisoner; knows Susan Leonard; I know that some one went there, but cannot say who; he was in the house and on the bed; looked like a negro; saw through the crack; heard Mrs. L. say, Lord-a-mercy, is this you Cato; he heard me coming and jumped off the window; about one and a half hours before day on Friday night before day; this year; last summer past; before Court; a light moon-shiney night;" "lived in a house over the bridge; Mrs. Leonard said she was *almost willing to swear it was Cato;* I have seen Mrs. L. and Cato speak when he was about the house;" "I believe to my certain knowledge that it was a negro; his head looked mighty kinky; he said he was one of Mr. Ely's negroes; he said it was Bill, who lived at the hotel; he said something about coffee or flour; she told him there was a white man there and she would call him; he told her to hush or he would kill her; heard *no scuffling; was close to the parties; she did not cry out,* if she had I could have heard her."

In addition to this testimony, there was abundant proof that both these witnesses were common prostitutes of the lowest grade. Upon this evidence and after the introductory remarks above referred to, his Honor the Judge below proceeded to charge the jury as follows:

" Rape is where a man has carnal knowledge of a woman by force and against her will. It will be seen by this, that, although a man may have unlawful carnal knowledge of a woman, if it be with the consent of the woman, it will not constitute the crime of rape. If, however, a woman yields through fear of death or some great bodily harm or duress, it will be rape.

" And even if the woman at first consented, if the offence were afterwards committed against her will, it would be rape; and if the offence were committed against her will, although she consented after the fact it would be rape.

" And if a man have carnal knowledge of a woman against her will, although she be a common strumpet or a common prostitute, it will be rape just as much as if the offence had been committed upon the purest and most virtuous woman in the world.

"Now, gentlemen of the jury, if you are satisfied from the evidence that the prisoner did have carnal knowledge of Susan Leonard against her will, and that he had sexual intercourse with her and accomplished his purpose against her will, then you must find him guilty. If you are satisfied from the evidence that Susan Leonard yielded to the sexual intercourse and to the carnal knowledge through fear of death from the threats of the prisoner, then you must find him guilty. If you are satisfied from the evidence that the prisoner had carnal knowledge of her against her will, by overpowering force, then you must find him guilty. Even if you are satisfied that Susan Leonard was a common prostitute, still if you believe from the evidence that the prisoner did have carnal knowledge of her against her will, then you must find him guilty.

"In prosecutions of this character, it is allowed the prisoner to prove that the prosecutrix is a common strumpet or a common prostitute. This is a fact which is permitted to go to the jury for what it is worth, to indicate the improba-

bility of a woman of such character withholding her consent to carnal knowledge of a man. To this extent it goes to her credibility, but it is for the jury, after all, to look to the testimony to see whether the statements of the prosecutrix are true, either in whole or in part. If, upon a fair and impartial survey of all the evidence, you are satisfied that she has stated the truth, you are at liberty to believe her. You are to weigh the testimony carefully, and the law constitutes you the exclusive judges of the facts of the case, and it is your province and your duty to determine, not only as to the effect which should be given to the whole evidence, but also as to the credit to which any and all of the witnesses are entitled. If, after this careful consideration of the testimony and the witnesses who have testified, you should come to the conclusion that the prisoner did have carnal knowledge of Susan Leonard, and against her will, then you must find him guilty. You must, in order to a conviction, be satisfied from the evidence that the carnal knowledge was had by a man of the woman Susan Leonard against her will; and you must also be satisfied from the evidence that the prisoner was the man who committed the crime.

"If the evidence in this case fall short of fixing upon your minds the moral conviction, beyond a reasonable doubt, of the existence of the two facts, that the crime was committed, and that Cato was the man who committed it, then you must acquit him. But, if these two facts are clearly made out to your satisfaction by the evidence in the case, then it would be your duty to find him guilty.

"You cannot be too deeply or too profoundly impressed with the deep solemnity of the duty which you have to perform. In the discharge of this duty you will be calm, dispassionate, impartial and just. You will so discharge this duty as shall afford protection to innocence and visit guilt with punishment You will give the prisoner the same fair and impartial trial that you would award to a freeman.

"I now commit the case to you, with the confident belief that you will discharge your duty fully, fairly, impartially and with firmness and fearlessness. You are to take the case into the jury room, where all the world is to be shut out, and in your retirement you are to ignore all extraneous circumstances, facts and influences, and you are to determine from the evidence itself, and from nothing else, whether the prisoner is guilty or innocent, after which you will return into Court and make the fact known by your sworn and solemn verdict. If, after a full view of the testimony and a fair and patient consideration of the same, you have upon your minds a reasonable doubt of the guilt of the prisoner, such a doubt must enure to his acquittal.

"I now dismiss you to your room, with the sincere hope that you may be guided to a correct and just conclusion as to the question of the prisoner's guilt or innocence."

It is insisted by the counsel for the prisoner, that in the body of the instructions the question of *force* is totally ignored, and that the issue presented to the jury was made to rest exclusively on that of *consent*. In examining these instructions, we find that the idea of *force and violence*, as constituting an ingredient of the crime, occurs only in the *definition* given of the offence. In but one of the many special instructions which were given to the jury is this idea incorporated, and the learned Judge seems to have confounded the two ideas of *force* and *want of consent*, and to have considered them as identical and as one and the same. From the very terms used to define the offence, it is quite manifest that there must be a *concurrence* of the two ingredients in order to give to the crime its full proportion.

It is sometimes said that a want of consent always implies force or violence. This may be true, considered in a strictly legal sense and when presented to a trained legal mind, but, in common parlance, (and juries can be addressed properly only in that language,) there is a very manifest difference.

TERMS HELD IN 1860.                185

Cato, a Slave, vs. The State.—Opinion of Court.

A woman may revolt at the very idea of yielding herself to the embraces of a man. Her moral sense may be shocked at the bare thought, and she be totally unwilling to commit the act, but impelled by the stress of circumstances growing out of her own necessities, she may be induced to take the fatal step in the total absence of any force or violence. This view of the matter is peculiarly applicable to the circumstances of this case. There is evidence of *solicitations* on the part of the alleged perpetrator, and of a parley between him and the prosecutrix. Mrs. Alsobrook testified that "he said he was one of Mr. Ely's negroes; he said it was Bill, who lived at the hotel, and he said *something about coffee and flour.*"

It is manifest from this evidence that at this particular point of time, *persuasion* and not *force* was being used by the person to overcome her will and to accomplish his purpose. And if we connect this evidence with the testimony of the prosecutrix, it will be seen that this effort at *persuasion* occurred subsequent to the *threat* testified to by her, for the purport of her evidence is that he made the threats to kill her *immediately* on her being aroused from sleep. Taking into consideration the degraded character of this witness, and that she was *contradicted* in several important particulars by the other witness on the part of the State, we think that it was a case which eminently demanded that the question of *force* and *violence* should have been kept directly before the minds of the jury, by occupying the most prominent place in the several instructions which were given to them by the Court. Such not having been the case, we are constrained to hold the objection to the instructions good and to sustain the *first* error assigned.

Upon the question of *identity* of the prisoner as the real perpetrator of the alleged offence, the Court are not satisfied that the evidence was sufficient to warrant the conviction of

186　　　　　　SUPREME COURT.

Cato, a Slave, vs. The State.—Opinion of Court.

the prisoner. That matter rested on the sole testimony of the prosecutrix, and is entirely uncorroborated by any concurring circumstances. It is true that the prosecutrix swears positively to the identity of the prisoner, as being the perpetrator of the alleged crime, but in this, if not contradicted, her testimony is greatly shaken by what she is alleged to have said to the other witness, Mrs. Alsobrook. She testified that "Mrs. Leonard said she was *almost willing to swear* it was Cato." Now, it is very evident that at the date of her communication to Mrs. Alsobrook, she was in *doubt* as to the identity of the guilty person. By what means that doubt was afterwards removed, so as to enable her to swear *positively* to the fact on the trial, does not appear.

Lord Hale, in referring to the character of this offence, has well said, "It is true that rape is a most detestable crime, and therefore ought severely and impartially to be punished with death; but it must be remembered that it is an accusation easily to be made and hard to be proved and harder to be defended by the party accused, though never so innocent." He then mentions two remarkable cases of malicious prosecution for this crime that had come within his own knowledge, and concludes: "I mention these instances that we may be the more cautious upon trials of offences of this nature, wherein the Court and jury may with so much ease be imposed upon, without great care and vigilance, the heinousness of the offence many times transporting the Judge and jury with so much indignation that they are over-hastily carried to the conviction of the person accused thereof by the confident testimony sometimes of malicious and false witnesses." *Vide* 1 Russ. on Crimes, 690–1.

Upon a full consideration of the whole case and after the most anxious deliberation, we are of the opinion that the prisoner is justly entitled to a new trial.

It is therefore *Ordered* that the sentence of death passed

upon the prisoner Cato, by the Circuit Court of Jackson county, on the 22d day of October, A. D. 1859, whereby he was adjudged to be executed on Friday, the 16th day of December then next ensuing, be vacated and annulled, and that the verdict of the jury rendered in the said case also vacated, annulled and set aside, and that the cause be remanded to the said Court, with directions to award to the prisoner a new trial therein.