# W. P. GULLATT v. STATE.

No. A-10331.   April 25, 1945.

(158 P. 2d 353.)

W. V. Stanfield, of Ada, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and A. C. Kidd, Asst. Co. Atty., of Wewoka, for defendant in error.

JONES, J.   The defendant, W. P. Gullatt, was charged in the district court of Seminole county with the crime of rape in the first degree; was tried to a jury who returned a verdict of guilty with a recommendation that a sentence of 15 years imprisonment in the State Penitentiary be suspended; sentence was pronounced in conformity with the verdict of the jury, and the defendant has appealed.

For a reversal of this case, the following assignments of error are presented: (1) The evidence is insufficient to sustain the verdict of guilty. (2) The court erred in admitting incompetent and prejudicial testimony and in permitting counsel for the state to continually ask leading and suggestive questions. (3) The trial court erred in not declaring a mistrial when it was shown by the evidence that the present county attorney had a contract with the mother of the complaining witness to bring a

civil suit against defendant, as a result of the alleged crime, which disqualified the present county attorney from prosecuting the case, and because of this disqualification, his assistant, who had active charge of the prosecution, was likewise disqualified to represent the State of Oklahoma. (4) That the court erred in not granting a new trial on account of newly discovered evidence.

For the purpose of disposing of this appeal, the first two assignments of error will be considered together. The defendant was an attorney in the city of Wewoka. The prosecuting witness, Grace Marie McGirt, was an Indian girl, who lived near the city of Wewoka. The defendant, in December, 1941, had discussed with the prosecutrix and her mother certain litigation involving the allotment of Dick McGirt, the father of the prosecutrix. Later, in January, 1942, one Charlie Cosar, a cousin of the prosecutrix, was arrested and incarcerated in the county jail at Wewoka, for allegedly committing a criminal offense. The prosecutrix and her mother went to the defendant to secure his assistance, if possible, in making an appearance bond for the said Cosar. The defendant made an appointment to meet the prosecutrix and her mother late in the afternoon of January 14, 1942. The prosecutrix at that time lacked two months of being 17 years of age and weighed about 122 pounds. She was attending high school.

The prosecutrix testified that the defendant and Nora Cully, an Indian woman, came to where she and her mother were living about 8 p.m. That she got in the automobile with the defendant and Nora Cully, and they drove to Willie Holotka's house and talked to his wife. They then drove to Louisa Holtulka's and stayed there about 30 minutes, talking to her about making Charlie

Cosar's bond. That they then drove to a store at the five-mile corner, where the defendant drank a glass of beer. That they then drove to Willie Palmer's place near Sasakwa, but didn't find anybody at home. That they then drove south of Sasakwa to the home of Nora Cully and left her there for the night. It was then about 10:30 p.m. That on the road returning home, between Sasakwa and Wewoka, the defendant turned off on a side road and stopped about a quarter of a mile from the highway, put his arms around the prosecutrix, and that she pushed him away. That defendant tried to get on top of her. That he kissed her. That they were stopped there about five or ten minutes before defendant turned her loose. That the defendant then said he would take her home. That he drove almost to her home and then turned towards Bunnie Harjo's place. That when they got within about a half a mile of Bunnie Harjo's place, defendant stopped the car again and wrestled with her, tearing two buttons off her dress. That they stayed there about 30 minutes. That they then drove back towards where prosecutrix lived and stopped about three-quarters of a mile from her home. That the defendant again tried to get on top of her, but she slapped his face. That the defendant then drove her back down toward Nora Cully's house, but when he started to turn in toward the house the prosecutrix grabbed the steering wheel and stepped on the gas because she did not want to go into the house. That she then asked to be taken to her cousin Bruner's home. That when they arrived at the Bruner home, there were no lights on at the place, so she did not get out. That they then drove to Seminole, and stopped first at a filling station and then at a tourist camp. That the defendant rented a cabin and drove his car into the garage adjoining the cabin. That the defend-

ant said he would sleep in the car and she could sleep in the bed in the cabin. That the defendant came into the cabin and while he was in the cabin, she took off the cowboy boots that she was wearing and anklets and got into the bed, and took off her dress while she was under the cover. That the defendant turned out the light and left the cabin. That she was tired and immediately went to sleep. That, later, she was awakened by the defendant getting in bed with her. That he was undressed. That he put his arms around her and tried to kiss her, but she moved her head back and forth. That the defendant then had sexual intercourse with her. The following leading questions were then asked the prosecutrix, to all of which the defendant objected, but his objections were overruled and exceptions allowed:

"Q. Did you struggle with him? A. Yes, sir. Q. Did you try to keep him from doing that? A. Yes, sir. Q. What did you do to try to keep him from doing that? A. I tried to get him off of me. Q. As hard as you could? (Not answered.) Q. Well, did you do everything within your power to keep him from having sexual intercourse with you, Grace Marie? A. Yes, sir."

The prosecutrix then testified that as it was beginning to get dawn she and defendant left the cabin and went to the bus station. That defendant offered her a dollar to buy a ticket home, but she refused, and went across the street to the highway and caught a ride to Wewoka. That when she got to Wewoka, she went to the county jail to see her cousin. That she did not tell him about anything that had occurred. That after visiting with her cousin in jail, she went back down on the street and ate her breakfast at a cafe about two blocks from the jail. That afterwards, she again returned to the jail and spent about an hour and a half visiting her

cousin. While she was at the county jail, at the request of her cousin, she called the defendant about making Cosar's bond and inquired whether defendant could go to Mitchell Palmer's and get him to sign the bond. That after finishing with her visit, she was coming down from the jail and met her mother, who was talking with another Indian woman. That when her mother saw the prosecutrix, she did not say anything, but walked up to her and struck her, knocking her senseless and making her nose bleed. That she was taken upstairs to the jail and first-aid administered and her nose doctored. That her mother then took her to the defendant's office to see why defendant kept her out all night, but the defendant was not there. That her mother then took her to the police station, to report on the defendant's keeping her out all night. That the prosecutrix then, at the police station, told one of the policemen about the defendant's having sexual intercourse with her. That he was the first person she had told. That the policeman took her to the county attorney's office and she repeated her story to the assistant county attorney and showed him her breasts where they had been bruised by defendant. That the county attorney then sent her to a doctor over the bank for examination. That she then went with her mother to see Bill Biggers, an attorney, and her mother hired him to sue the defendant for damages. That Mr. Biggers sent her to Dr. Grimes for another examination.

On cross-examination, the prosecutrix testified that while she was out with the defendant that night they passed several cars. That she did not scream during any of the time because she was afraid of the defendant. That she did not say anything to the filling station man where the defendant stopped because she did not think of that

then. That she did not say anything to the man at the tourist camp because she knew that if she did, the defendant would have lied out of it. That she made no effort to get out of the car at the filling station and go into the ladies' rest room and hide or to avoid the defendant in any way. That the tourist camp operator went into the cabin first and lit the fire, and that she did not speak to him at all. That when defendant left the cabin the first time, she made no effort to lock the door so that he could not return. That when the defendant committed the act with her, she had on a girdle, a slip, and a pair of pants, and that none of these articles were removed. Prosecutrix further testified that she slept a part of the time when the defendant was driving between Konawa and Seminole. That the two doctors who examined her at the request of the assistant county attorney and Mr. Biggers were Dr. Williams and Dr. Grimes.

In addition to the testimony of the prosecutrix, the following witnesses testified for the state in its case in chief:

Nora Cully testified concerning the trip which she made with the defendant and the prosecutrix to the various places mentioned by the prosecutrix in her testimony. That the witness was taken home between 10 and 11 o'clock. She further testified that the prosecutrix said she wanted to be in Sasakwa the following morning in order to get Willie Palmer to sign the Cosar bond.

Alice McGirt, mother of prosecutrix, testified that she and prosecutrix were living on Josie Steven's place north of Wewoka. That in December, she had been talking with defendant about a lawsuit involving her husband's allotment. That on January 14th, she was in defendant's office talking about the lawsuit and also about

making a bond for Charlie Cosar. That defendant agreed to come to her place that evening and see what he could do. That at defendant's request, she let her daughter, Grace Marie, go with him to see Bunnie Harjo. That her daughter did not return home that night. That the next morning she went into Wewoka and reported to the police force that her daughter did not come home. That, later, she was at the courthouse and saw her daughter, and when she did, she walked up to her, and struck her on the face and knocked her to the floor. That she only struck her the one blow. That she, with others, then carried the girl upstairs to the jail where she washed her face and let her rest a little while before they left. That when they left the courthouse, she went to the defendant's office to find out where he had been the night before with her girl. That she took Grace Marie along. That she asked her daughter where she had been the night before and all she said was, "with Bill." That she knew she meant the defendant. That she took the prosecutrix to the police station and the prosecutrix there told the policeman what had transpired the night before. That the policeman then took her and Grace Marie to the county attorney's office, and, later, to Dr. Williams' office for examination. That after they left the doctor's office, she took the prosecutrix home. That the prosecutrix was sick.

On cross-examination, she testified that after she had struck her daughter in the courthouse and knocked her out, she asked her why she did not come back during the night, to which the prosecutrix replied, "Mama, I don't know why he didn't bring me back." That after she had gone to the county attorney's office with the prosecutrix, she went to Mr. Bill Biggers' office and employed him to bring a suit against defendant for damages. She ad-

mitted that she sent her uncle, Jacob King, and an Indian preacher by the name of Stanley Smith to see defendant about dismissing the prosecution. That she wrote on a note the amount of money that it would take to settle the case, and signed the note. That she offered to settle the case and dismiss the prosecution for a total of $6,850, of which $1,850 was to go to buy her a home and the other $5,000 to her daughter for damages. It was brought out on cross-examination that the defendant called the witness after talking to the two Indians about the proposed settlement, and that the defendant's stenographer listened to the conversation and made a transcript of it. Counsel for defendant read from this transcript of the conversation between Alice McGirt and the defendant, and Mrs. McGirt admitted that the following statements, among others, were made by her and the defendant in that conversation:

"Q. (By Defendant): Is that the amount? A. Yes. Q. Well, won't you just withdraw the charges without any money. You know I'm not guilty. A. No, not without the money. We'll just see you in the morning. Q. And if you get the money, you will dismiss the case? A. Yes. Q. Do you really want to see me go to the Penitentiary? A. I guess not, if you don't pay us— Q. But, if I pay, I won't have to go? A. Yes. Q. That money is the smallest amount you would take? A. Yes. Q. Did you see Mr. Biggers? A. Yes, he called me a while ago."

The witness further stated that she saw her daughter about 9 a.m., and talked to her a long time, but that she didn't know what had happened until she heard her daughter tell it at the police station.

Elmer Alloway testified that he operated the Halloway Courts, on the west edge of Seminole. That on the night of January 14, 1942, he rented a cabin to defend-

ant. That he only saw two people in the car. That the defendant drove up to his office in the car and tooted his horn, and asked for a cabin. That he rented them cabin No. 56. That he went in the cabin, lighted the fire, defendant paid him, and he went back to his office. That the young lady with the defendant walked into the cabin first and defendant followed. That he did not see the defendant or the lady again.

On cross-examination, he testified that all of his cabins were occupied that night. That the cabins were in two rows and those in each row were joined to each other. They are not composed of any sound-deadening material. The garage which is adjacent to each cabin does not have a door, but is open. Each cabin is fastened by a latch on the inside. The witness did not notice any disarrangement about the clothing of the young lady who was with the defendant, or of anything unusual or uncommon about the appearance of either of them. Witness did not notice whether the woman with defendant was an Indian woman or white woman.

Willene Harrison testified that she was employed as a stenographer in the county attorney's office. That she examined the breasts of Grace Marie McGirt when she came to the county attorney's office on January 15th. That she saw a discolored place above each breast.

Price Azlin testified that he was a policeman in the city of Wewoka. That he talked with Grace Marie McGirt, the prosecutrix, and her mother around 10:30 or 11 a.m. on January 15th. That the mother had called about 7 o'clock that morning and reported that the daughter had been gone from home overnight. That after he talked to the girl, he took her to the county attorney's office. That he saw some "blood-shotten" places on her

breasts. That he took the girl to Dr. Williams for an examination.

Dr. J. Riley Williams and Dr. J. P. Grimes testified on behalf of the defendant. These two doctors were the men who examined the prosecutrix within a few hours after the alleged assault occurred. After they made their reports to the county attorney's office, they were not called as witnesses by the prosecution, but were placed on the witness stand by the defendant. The testimony of these two doctors were substantially the same. Part of the testimony of Dr. Williams is as follows:

"Q. What did you do, Doctor, in making your examination? A. First, I had her to undress and take off her underclothes. Q. What did she have on? A. Step-ins and outer clothes. And I then proceeded to examine her with a speculum by inserting it into the vagina and made my examination. Q. In order that we might understand, you say you examined her with a speculum, what is that instrument? A. It is an instrument that has two prongs that you can open up and they will hold the parts open so that you can examine the person better. Q. How did you use that instrument? A. I inserted it into the vagina and opened it up. However I had a headgear that I used and that makes a good light. Q. What size instrument is this speculum? A. They come in three sizes— large, medium and small. Q. Which size did you use? A. That was one of the large size. Q. Did you have any difficulty in inserting that instrument, Doctor? A. None whatever. Q. It went in easily? A. Yes, sir. Q. You inserted it its full length into her vagina, did you? A. Yes, sir. Q. Was there any complaint made by the young lady upon the insertion of that instrument? A. None whatever. Q. There was no pain or discomfort while you were inserting it? A. That is correct. Q. Could you insert such an instrument into the vagina of a chaste 16 or 17 year old girl, one of that size, without causing pain and discomfort to her? A. No, sir, I don't think so. Q.

How did you find the size of the vagina of this girl in comparison with a mature married woman who had been having sexual intercourse for several years? A. Well, it was a very large vagina for a girl of her age. * * * Q. Do you or not, from your examination, think that she had committed the act of sexual intercourse or had committed masturbation a great number of times? A. I am inclined to think that she had. Q. Did you find anything, from your examination to indicate that she had been raped or ravished? A. From my examination I didn't find anything that would indicate that. Q. What condition did you find her vagina in with reference to being dry or wet —what condition was it in? A. It was quite dry—there was no secretion. Q. Assuming, Doctor, that she contended that at about the hour of six o'clock or between the hours of 5 and 6 of that morning that she had been raped and had had sexual intercourse and that she had done nothing to her vagina in the way of doing something to cleanse it, assuming that to be true, would you have expected to find something in her vagina to indicate that that had happened—that that experience had been realized? A. I would have expected to have found something, yes. Q. Did you observe or examine that girl's breasts? A. No, I didn't examine her breasts. Q. How long did you keep that speculum in her vagina, Doctor? A. I presume five or seven or eight minutes. Q. During all of that time was there any complaint made to you by her that she was suffering any pain or discomfort? A. None. Q. Did she make any statement to you about having been ravished or raped by anyone? A. She didn't talk very much, in fact, there was very little conversation between us. Q. Now, Doctor, how did the vagina which you examined on that little girl compare with the vagina of an ordinary girl of her age who had not had sexual intercourse or who had not committed the act of masturbation? A. It was much too large for a virgin. Q. Do you think that you could have inserted that instrument into her vagina if she had been a virgin without pain? A. No, sir.

The doctor further testified that the hymen had com-

pletely disappeared, which indicated in his opinion that she had had frequent acts of sexual intercourse or masturbation. That he could not find anything in his examination to indicate that the girl had had sexual intercourse in the last 12 hours. That unless the prosecutrix had taken a douche, there would have been some secretion present in her vagina for some 24 to 36 hours after an act of sexual intercourse had been completed.

Dr. Grimes's testimony was substantially the same as Dr. Williams', except he testified that she had a bruise over each breast. He also made a careful examination and was unable to detect any spermatozoa present in the vagina of the prosecutrix which would indicate a recent act of sexual intercourse. The bruised places on the breasts of the prosecutrix were about two or three inches above the breast. The doctor further testified that the lips of the outside walls of the vagina will develop with repeated acts of sexual intercourse. That, in his opinion, she was developed as much as a normal married woman is after she has been married for ten years without child-birth.

He further testified:

"Q. What had become of the ring of hymen which you ordinarily expect to find in a maiden? A. It had disappeared entirely—there was no semblance of it at all. Q. What will cause it to disappear? A. Sexual intercourse or repeated masturbation—of course, masturbation is quite a bit slower than intercourse—it would depend altogether upon the instrument used in the masturbation."

He further testified that the prosecutrix had on the girdle and pants which she said she had on at the time of the alleged attack, and in this connection, the testimony is as follows:

"Q. Did she have them on when she came to your office? A. Yes, sir, she had them on in reverse, however, she had the girdle beneath the pants. Q. Did you have her to remove them so that you could make your examination? A. Yes, sir. Q. Now please tell us whether with the pants being worn on the outside of the girdle or on the inside of the girdle, would it be physically possible for a man to have intercourse with a woman so clothed? A. I think you could have sexual intercourse with her but you would have to have her consent."

The doctor further testified that Mr. Biggers came to his office and made arrangements for him to make the examination about 5 p.m., on January 15th.

The defense was in the nature of an alibi. The defendant testified and introduced proof by other witnesses to show that, on the night in question, after he had left Nora Cully at her house, he picked up Susie Cully, another Indian woman, and Tom Bennett, a white man, whom the defendant was representing in some paving bond foreclosures. That they had to go to Oklahoma City to get some paving bond ledgers belonging to Bennett. That the prosecutrix wanted to go to Seminole and stay with her uncle. That when they got to Seminole, they could not find her uncle's house, and defendant rented her a cabin. That after he rented her the cabin, he, Susie Cully, and Tom Bennett drove over to Oklahoma City, secured the bond ledgers, and returned to Wewoka, arriving early in the morning. The defendant specifically denied the alleged acts of assault related by prosecutrix.

Susie Cully testified in corroboration of the story related by defendant, but her credibility was weakened by a showing on cross-examination that she had made a statement in writing to the county attorney the day after the alleged offense occurred, which varied in some material particulars from her testimony.

The state, on rebuttal, also, showed by witnesses from a hotel in Wewoka that Susie Cully was at the hotel during a part of the time that it was claimed by the defendant that she was with him, and, also, that Tom Bennett was in Wewoka during the greater part of the night in question.

Other witnesses testified on behalf of the defendant, but their testimony is immaterial to the disposition of this case. As we view the matter, the question of the sufficiency of the evidence can be determined by a consideration of the testimony of the prosecutrix, her mother, and the two doctors who examined her shortly after the alleged crime was committed.

This prosecution is instituted under the provisions of 21 O. S. 1941 § 1114, wherein it is provided that rape committed by a male over 18 years of age, accomplished with any female by means of force overcoming her resistance, is rape in the first degree. Unless the proof of the state shows that the defendant accomplished the act by means of force overcoming her resistance, then the evidence is insufficient to sustain a conviction under the information herein filed.

In the case of Williams v. State, 61 Okla. Cr. 396, 68 P. 2d 530, 538, the following language is used:

"While it is the law of this state, as in most others, where not modified by statute, that a conviction for rape may be sustained upon the uncorroborated evidence of the outraged female, it is nevertheless equally well settled that the appellate court will closely scrutinize the testimony upon which the conviction was obtained, and, if it appears incredible and too unsubstantial to make it the basis of a judgment, will reverse the judgment."

In the case of MacLaurin v. State, 34 Okla. Cr. 324, 246 P. 669, 671, it is stated:

"It is true that convictions for rape must rest largely upon the testimony of the prosecutrix, and direct corroborating testimony is well nigh impossible to procure. However, where the charge is true, there will almost always be some corroborating evidence, such as injury to the person or clothing of the prosecutrix, or the fact that she made complaint as soon as practicable, and without unreasonable delay, and it is always legitimate to consider whether the subsequent conduct of the prosecutrix is the usual and natural conduct of an outraged woman as bearing upon the credibility of her direct testimony."

In Wines v. State, 7 Okla. Cr. 450, 124 P. 466, 470, we said:

"It is the natural impulse of every honest and virtuous female to flee from threatened outrage, and if assaulted to make complaint at the first opportunity, and where this is not done, and no reasonable explanation is made, it is a strong, but not a conclusive, presumption against the truth of the accusation."

In Witt v. State, 29 Okla. Cr. 357, 233 P. 788, 789, in reversing a conviction for rape, it is stated:

"The charge is one that arouses the passions and prejudices of jurors, and for that reason it is the duty of the court to closely scrutinize the evidence, and where the evidence of the state is unreasonable, inconsistent, and contradictory, and there is inherent evidence of improbability or indications that the prosecution is maliciously inspired, the court should not permit a conviction to stand."

In the case of Johnson v. State, 52 Okla. Cr. 397, 5 P. 2d 772, the facts in support of the prosecution are much stronger than those presented herein. The case was reversed, and in the body of the opinion, it is stated:

"It is settled by many decisions of this court that a defendant may be convicted of rape upon the uncorroborated testimony of the woman. In a prosecution for

rape by force overcoming resistance upon a woman above the age of consent, where the corroboration of the use of force is extremely slight and the testimony of the prosecutrix somewhat inconsistent and unsubstantial, this court will scrutinize the record with care. The age, surroundings, circumstances, situation, and conduct of the parties will be considered. Where no threats nor use of force are made to intimidate the female, where she is in easy call of others, if an outcry is made, and none is made, and no complaint is made for several hours, it appears improbable that any rape occurred, but rather that the intercourse was voluntary. MacLaurin v. State, 34 Okla. Cr. 324, 246 P. 669; State v. Hogg, 64 Or. 57, 129 P. 115; State v. Goodale, 210 Mo. 275, 109 S. W. 9."

When this prosecution is measured in the light of the above authorities, it is apparent that the conviction should not stand. It may be that the defendant committed an act of sexual intercourse with the prosecutrix. However, if the testimony of the doctors who examined her shortly after the act is alleged to have been committed is to be believed, no such act was completed. The conduct of the prosecutrix refutes any theory that force was used upon her to accomplish the act. We are not unmindful of the fact that some buttons were torn from the dress of the prosecutrix, and that there was a bruise above each breast, but, even under the story of the prosecutrix, the buttons were torn from her dress early in the evening, five or six hours before the alleged act of sexual intercourse was committed. Thereafter, the prosecutrix could have left the company of the defendant on many occasions or told some of the parties she said they saw of the defendant's conduct toward her. In this connection, we must also consider the proposition that the prosecuting attorney continually elicited answers by asking leading and suggestive questions and that during the testimony of the prosecutrix, at all points where material matters arose,

the prosecuting attorney suggested the answer which he desired by the asking of leading questions. We have hereinabove set forth some of the leading questions asked of the prosecutrix, concerning the actions of the defendant at the time the alleged act was committed, which is the basis of the prosecution. In addition to those leading questions, the record discloses the following questions, among others, which were asked and answered in most instances over the objection and exceptions of counsel for defendant; most of the answers were "yes" or "no:"

"Q. Did you turn off of the highway any place or anywhere between Sasakwa and Wewoka? * * * Q. Did Mr. Gullatt stop the car after you had turned off onto that road and had gone about a quarter of a mile? * * * Q. What else did he do—what did he do with his hands? * * * Q. Did he take hold of your person anywhere? * * * Q. How did you try to fight him off? A. I tried to push him away. Q. With your hands? A. Yes, sir. Q. Did you say anything to him, Grace Marie? * * * Q. Did he continue to do the same things— * * * Q. Tell us whether he got out from under the steering wheel or not? * * * Q. Did Mr. Gullatt do anything about unfastening or disarranging any of your clothing? * * * Q. Did he kiss you while you were in the car? * * * Q. Did you try to keep him from doing that? * * * Q. Did you use all of the force you could to try to get him to quit? * * * Q. Well, did Mr. Gullatt tell you what he was going to do if you would get back in the car—where he would go? * * * Q. Did he have hold of you? * * * Q. Did he tell you anything about a divorce? * * * Q. Did he put his hands on you? * * * Q. Did you do anything about it when he was doing that? * * * Q. Can you tell the jury whether he unbottoned his clothes or not? * * * Q. Did he get on top of you? * * * Q. Is that what you wanted him to do? * * * Q. Did he tell you why he hadn't taken you back to your mother's? * * * 'Q. Now, did he help you to get in the cabin, Grace Marie, have hold of you? * * * Q. Did you have on a coat? * * * Q. Did Mr.

Gullatt come in the cabin or not? * * * Q. Did he go back out then? * * * Q. Did you ever get out of that car except the one time that you told about? * * * Q. Did you ever try to get out any more? * * * Q. He wouldn't let you? * * * Q. Will you tell the jury whether or not you had scuffled and fought and wrestled with that man practically all the time from the time you left Nora *Harjo's* place until you finally made all of those rounds you told about and finally got up there to that cabin at Seminole? * * * Q. Tell the jury whether or not you were tired? * * * Q. Did you go to sleep immediately? * * * Q. After you got in bed did Bill Gullatt come back in there? * * * Q. Had he woke you up? * * * Q. Did he put his arms around you? * * * Q. Did he do anything to you about your breasts? * * * Q. Did you struggle with him? * * * Q. Did you try to keep him from doing that? * * * Q. Well, did you do everything within your power to keep him from having sexual intercourse with you, Grace Marie? * * * Q. Tell the jury whether or not you had done everything that you could do all during that night to keep Bill Gullat from raping you? * * * Q. Did you tell Mr. Biggers what had happened? * * * Q. Did you tell him the same story and the same things that you had told Mr. Azlin and your mother? * * * Q. Did you eat anything during that time? * * * Q. Do you know whether or not the wrestling and scuffling and fighting him off that you had done with Bill Gullatt all night long that night before had made you sick and was that why you had to go to bed?"

It will be readily seen from an examination of the above that on the pivotal issue as to whether force was used at the time the act was committed, the testifying was done by the examiner and not by the witness. The trial court himself took cognizance of the fact that leading questions were asked in many instances. Undoubtedly, he realized that the conduct of the prosecution in the instant case in this regard exceeded the bounds of cor-

rect procedure, as we find the trial judge stating in his ruling upon the motion for a new trial:

"Of course, in this case, I have got to look at it from all of the circumstances and things and of course there were a lot of the questions that were leading but I have had that trouble a lot, I don't know why but when a man gets to representing the state he seems to think he has a right to lead his witnesses—every one of them do it. I notice that is the biggest trouble that a county attorney has after he gets out of office. I can go off somewhere and start in trying a case and will know within a few minutes if any of the lawyers trying the case has ever been county attorney by the way he leads the witnesses. Sometimes the courts have reversed cases on that ground and sometimes they don't."

It is a settled rule of law that leading questions should not be asked a witness by the party placing him upon the stand. Mulkey v. State, 5 Okla. Cr. 75, 113 P. 532; Ostendorff v. State, 8 Okla. Cr. 360, 362, 128 P. 143; Campbell v. State, 23 Okla. Cr. 250, 214 P. 738.

The exception to this rule of law is where a witness proves hostile to the party putting him upon the stand and friendly to his adversary, or where the witness is trying to evade the questions asked. Then, the trial court in its discretion may relax the general rule of law and permit leading questions to be asked. Gardner v. State, 5 Okla. Cr. 531, 115 P. 607; Morris v. State, 35 Okla. Cr. 5, 247 P. 418.

We are not here confronted with a case where the witness is hostile, evasive, illiterate, or unfriendly to the prosecution. She was a high school girl, and there is nothing in the record to show or indicate that she is below the average girl of her age in mentality.

The testimony of Dr. Williams and Dr. Grimes, in

whom the police officer and the county attorney's office, had sufficient confidence to ask that they examine the prosecutrix, is entitled to the deepest consideration in determining the truthfulness of the story related by the prosecutrix. When the testimony of these two doctors is considered, together with the fact that on all pivotal issues leading questions were asked by the prosecuting attorney, together with the admitted fact that the prosecutrix and her mother offered to dismiss the prosecution upon payment of a sum of money, together with the further fact that the prosecutrix did not make an outcry, that she had on under-garments which she admitted were never removed, that she talked to the defendant over the telephone the next morning and asked him to take her to see Willie Palmer to see him about signing her cousin's bond; that she did not tell her mother that she had been raped until after her mother took her to the police station, and there in the presence of her mother, they began to question her as to where she had spent the night. All of these factors indicate that if there was an act committed it was voluntary and not through force.

The prosecutrix testified that she had never had sexual intercourse with any other person than defendant, but this testimony is wholly in variance and inconsistent with the findings of the doctors made the day the act is alleged to have occurred. It appears that during the trial of the case, after Drs. Williams and Grimes had testified, the state had two doctors examine the prosecutrix and they testified that in their opinion the prosecutrix was normal for a girl of her age. Both of these doctors, however, refused to express an opinion as to whether the prosecutrix had been committing acts of sexual intercourse.

Attached to the defendant's supplemental motion for a new trial on the grounds of newly discovered evidence were affidavits of several witnesses, which, if true, would have refuted some of the material parts of the testimony of the state. Two of these witnesses testified at the hearing on the motion for a new trial. It is unnecessary for us to discuss the merits of this proposition, because we are of the opinion that the testimony of the prosecutrix, when considered with the other admitted physical facts, is wholly insufficient to show that the sexual act was accomplished by the use of force.

The state based their case solely upon their contention that the defendant used force which overcame the resistance of the prosecutrix and accomplished the act against her will. The evidence is wholly insufficient to support this theory of the case.

At the time the charges in this case were filed, Tom Biggers was county attorney of Seminole county. His brother, Bill, was engaged in the private practice of law. Shortly after this prosecution was instituted, Tom Biggers joined the United States Armed Forces, and Bill Biggers was appointed county attorney. Before his appointment as county attorney, Bill Biggers consulted with Mrs. McGirt and Grace Marie McGirt concerning a possible lawsuit against the defendant for damages. Following his appointment as county attorney, Bill Biggers did not further represent the prosecutrix or her mother in any civil litigation involving this case, so far as the record discloses, and he did not participate in the prosecution. There is nothing at all to indicate anything improper in the conduct of Bill Biggers or any other of the counsel involved in this prosecution. They were each apparently convinced of the defendant's guilt and did their best to

secure a conviction. It is unnecessary for us to decide the legal question presented as to whether A. C. Kidd, assistant county attorney of Seminole county, was disqualified to prosecute defendant because of the fact that his superior officer, Bill Biggers, considered himself disqualified and refused to appear in the case.

For the reasons hereinabove stated, the judgment and sentence of the district court of Seminole county is reversed.

BAREFOOT, P. J., concurs. DOYLE, J., not participating.