118 So.2d 806 (1960)
Leamon JOHNSON, Appellant,
v.
STATE of Florida, Appellee.
No. 1276.
District Court of Appeal of Florida. Second District.
March 4, 1960.
Rehearing Denied March 28, 1960.
Pat Whitaker, Whitaker Brothers, Tampa, and M.H. Rosenhouse, Rosenhouse & Rosenhouse, Miami, for appellant.
Richard W. Ervin, Atty. Gen., Irving B. Levenson, and Joseph Nesbitt, Asst. Attys. Gen., for appellee.
ALLEN, Chief Judge.
Leamon Johnson, the appellant, was convicted February 25, 1959, of the crime of rape, was adjudged guilty and sentenced to serve a 25 year term in the state prison. Thereafter the defendant took this appeal.
The defendant was charged with raping the prosecutrix on September 2, 1958. The defendant became acquainted with the girl about a year previous to the above date in a theatre in West Palm Beach. They sat together for 30 minutes after which they went across the street to a snack bar and consumed a cold drink. The defendant asked the girl for a date but she explained that before she could date a boy or man, her parents must meet and approve of him. The defendant thereafter went to the girl's house, met her parents, but they forbade her to date him. From that time until the date in question the parties did not see each other, but the defendant telephoned her almost every day.
From the prosecutrix's testimony it appears that she was 18 years of age on September 2, 1958; that she was a senior in school; that she had been uptown shopping and was sitting on a bench outside of Kress Dime Store waiting for a bus about 3:00 o'clock in the afternoon when the defendant approached her and asked if she would like a ride home. The prosecutrix consented and walked with defendant *807 two blocks to where his car was parked. They got into the car and defendant proceeded to drive the proper route to her home. While riding along, the defendant tried to kiss the prosecutrix and she refused. It appears that some distance further the defendant stopped the car in a residential area and, according to prosecutrix's testimony, he went into the house and returned in a few minutes and during this time prosecutrix waited for him in the car. According to the defendant, he stopped and walked over and talked to a friend and then returned to the car.
They proceeded on toward home but then the defendant turned off the main highway down a country road adjoining a lake. The prosecutrix stated that she tried to jump out of the car but that defendant held her hand with his right hand thus preventing her from jumping. The defendant denied this in his testimony. They arrived at the lake at a spot where there was an overhanging tree, whereupon the defendant stopped the car and said, "If you had let me kiss you, all of this would not have happened." The defendant testified that he told her to "put out or walk home," which would have been a distance of approximately one mile. The prosecutrix stated that the defendant then slid over her and got out of the right side of the car; that he then made her lie down ("He took his hand, threatened me back with his hand"); that he stood by the car and dropped his trousers and shorts to his ankles; that all the while he was holding her legs; that he then got on top of her; that he held her hand with one of his hands while lifting her dress and removing her panties with his other hand; that she tried to get up, causing a small tear in her skirt; that she screamed once; that intercourse then took place, lasting for about 15 to 20 minutes; and that she "shoved his shoulders" but did not cross her legs or resist in other ways.
This all took place around 3:30 p.m. It was drizzling rain, which accounts for the only evidence of soiling on the prosecutrix's clothes and undergarments. There was no tear in the panties and only the small tear, mentioned above, in the dress. There is no evidence as to the physical stature or strength of either of the principals. The girl was 18 and the defendant was 21. When the prosecutrix was asked if she tried to escape, she answered,
"Well, I was already down in the seat then I couldn't very well get out. He was much stronger than I was."
After the act was consummated, the prosecutrix stated that the defendant got out of the right door and put his clothes back on; that he then slid back over her to the driver's side; that she then dressed herself and closed the right car door; that he took her home, during which time they discussed why she would not date him; that at no time did the defendant threaten her with any weapon; and that they arrived home at approximately 4:00 p.m., a period of one hour from the time they left town together.
The defendant testified that the prosecutrix did not try to get out of the car while driving to the lake; that upon arriving at the lake, he got out of the left side of the car and walked around to the right front door and undressed; that the prosecutrix cooperated and acquiesced to his advances; that while driving home they laughed and joked; and that no resistance or resentment was manifested by the prosecutrix at any time.
The mother of the prosecutrix arrived home about 4:30 p.m. and found the prosecutrix doing her homework. Upon noticing that the girl was upset, she questioned the girl sometime later about what was troubling her. The girl finally broke down and told the mother about the incident, whereupon the mother called the sheriff.
A doctor testified that there were no bruises or marks of any kind on the prosecutrix when he examined her some three or four hours after the incident. He did state that there was evidence of recent intercourse, *808 but that the girl was not unusually upset or nervous at this time in view of the nature of the examination.
This court has carefully reviewed all the evidence from the transcript filed in this case and has concluded from such study that the defendant should be granted a new trial.
Florida Statutes, § 794.01, F.S.A., defines rape as follows:
"Whoever ravishes and carnally knows a female of the age of ten years or more, by force and against her will * * * shall be punished by death, unless a majority of the jury in their verdict recommend mercy, in which event punishment shall be by imprisonment in the state prison for life, or for any term of years within the discretion of the judge. * * *"
It will be observed that the statutory definition of rape requires such act to be accompanied by force and against the will of the female participant. A conviction may be obtained in Florida for rape on the unsupported testimony of the prosecuting witness when such witness is not fully impeached or discredited, particularly where there are corroborative facts and circumstances in evidence. See Ex parte Tully, 70 Fla. 1, 66 So. 296; Annotation 60 A.L.R. 1124; and Truluck v. State, Fla. 1959, 108 So.2d 748. Where the sole witness to the prosecution is the prosecutrix, her testimony is required to be rigidly scrutinized to avoid an unmerited conviction. See Coker v. State, 83 Fla. 672, 93 So. 176.
In a landmark case of this State, that of Hollis v. State, 27 Fla. 387, 9 So. 67, the Supreme Court granted a new trial in a rape case because of the insufficiency of the evidence as to force or fear to supply resistance on the part of the prosecutrix. The pertinent evidence is set out in the opinion of the Court as follows:
"`My name is * * * I am fourteen years of age, and live at Green Cove Springs, Clay County, Fla. I live with my father and mother. Our house is in an orange grove. The trees are pretty thick, and grow all around the house. I know the defendant at the bar. He came to our house one day last April, and asked me for a cool drink of water. I showed him the well, and told him to get it. Then he asked me if he could go through our house to Sallie Hooper's. He came in the house and caught me, and put one arm around my waist, and one hand over my mouth, and threw me down. He then slipped his hand down so that his arm would press on my throat, and told me if I hallooed he would kill me. Then he pulled up my dress, and put his thing in me, and penetrated me. When he got up he said: "There, now, I have broken the law." Then he went off. My mother was cooking for Mrs. Moore, and my father was working at the wharf. I went to Mrs. Moore's, and told my mother what had happened. There was a little blood on my underclothing, in front, and I was sore for several days afterwards.' Cross-examination: `There are several families living near our house, just across the street. I can see these houses from my house, and can see the people passing about their places. * * *'"
There was other testimony in the record but apparently the testimony of the prosecutrix was the basis of the Court's decision to grant a new trial. The Supreme Court, in its opinon in the above case, further stated:
"It is contended on behalf of plaintiff in error that the testimony does not show that the connection was consummated by force, and against the will of the prosecutrix. The statute contemplates that the offense shall be `by force, and against her will.' Section 36, p. 355, McClel. Dig.; 2 Bish. Crim.Law, 1113; Charles v. State, 11 Ark. 389; State v. Murphy, 6 Ala. *809 765. There must be a concurrence of these two ingredients. Cato v. State, 9 Fla. 163, 184. If force was used, and yet the carnal knowledge was not against the will of the female, the crime of rape has not been committed. * * *
* * * * * *
"Mr. Bishop, in his work on Criminal Law, (volume 2, § 1122,) says it is plain that in the ordinary case where the woman is awake, of mature years, of sound mind, and not in fear, a failure to oppose the carnal act is consent, and though she objects verbally, if she makes no outcry and no resistance, she by her conduct consents, and the carnal act is not rape in the man; that the will of the woman must oppose the act; and that any intimation favoring it is fatal to the prosecution. He, however, disapproves the doctrine as to resistance affirmed in People v. Dohring, supra, and says that the text of the law, and the better judicial doctrine, require only that the case shall be one in which the woman did not consent. Her resistance however, must not be a mere pretense, but in good faith * * *
* * * * * *
"The question here is whether or not the evidence can be said to be sufficient to show to the minds of any fair jury, beyond a reasonable doubt, that the act was done by force and against the will of the prosecutrix. The alleged offense is shown to have been committed in the daytime, in a village, in a house `near' to which several families live `just across the street,' the people of which families the prosecutrix says she could see passing about their places. There is no evidence whatever of resistance, no attempt to prevent his throwing her down, no use of her arms, legs, or body against his efforts to throw her down. There was no struggle either before or after she was down. No clothing is shown to have been torn. No bruise of any part of her person. Nothing on this line is stated as the result of the connection which might not have occurred if it had been with her fullest consent. Granting that his putting his hand over her mouth at the time that he put his arm around her waist sufficiently accounts for the absence of outcry prior to her being put down, it does not do so as to want of resistance. There is moreover no showing, whatever might be its effect, that the taking hold of her was in such rough or brutal manner as to put a woman of mature years and intelligence in fear of loss of life or other great danger, and thereby suppress or deter resistance on her part, or that she was actually in such fear. All that we have proven up to the point of her being thrown down is that it was done in the manner stated, but without any opposition or resistance on her part. When she has been put down, we find that he threatened he would kill her if she hallooed. True it is that the threat is evidence tending to prove his purpose to consummate the carnal knowledge against her will, but it is not of itself evidence that she was making any resistance of any kind to his efforts. Up to this time she had made none, and she is not shown to have made any afterwards. * * *."
The evidence in the case now before this court presents weaker testimony than outlined in the above case of Hollis v. State, supra, to show force or lack of consent from fear. The prosecuting witness testified that she was 18 years of age, a senior in high school; that she had become acquainted with the defendant approximately a year before the date of the alleged crime; that her father and mother would not permit her to have dates with the defendant; that she had talked with him over the phone for he had called her about every day; that she saw him on September 2, 1958, while she was waiting for a *810 bus; that he came and sat down and started talking; that he offered to carry her home but she said it would not be necessary but she went with him; that they drove down to the Okeechobee Road where the defendant went into a rooming house where he said he had to go to talk to a friend; that she stayed in the car while he was gone; that on his return to the car they drove on to Okeechobee Road. The following questions and answers appear in the record:
"Q. Is Okeechobee Road the way to get to your house? A. Yes, sir, it is. We went to Knox Feed Store. He turned right, around, at first turn he made a left hand turn. I tried to get out of the car, didn't make it.
"Q. What happened then? A. He jerked me with his hand. I couldn't get out of the car. I don't know how he did. He managed to keep on driving.
"Q. What hand did he grab you with? A. He grabbed me with his right hand.
"Q. When you started to get out? A. Yes, I was sitting on the other side of the car.
"Q. Then what happened? A. He brought me down by this lake. There is an overhanging tree. He drove me down there, not too far from there, he stopped the car.
"Q. Are there any buildings or houses close by there? A. No, sir.
"Q. When he finally stopped in that area, what did he say to you? A. He told me earlier that evening he tried to kiss me, to get me to sit closer to him. He said if you had let me kiss you, all of this would not have happened.
"Q. Then what did he do? A. He raped me.
"Q. What did he say to you when he started to rape you? A. He told me to lay down on the seat. I wouldn't do it. He made me lay down.
"Q. How? A. He took his hand, threatened me back with his hand.
"Q. Did what? A. As I was sitting up, I wouldn't lay down on the seat myself. He took his hand and threw me back.
"Q. Did he say anything to you as to what he would do? A. No, he didn't mention anything about it.
"Q. What did he do with his hand? A. Well, after he laid back on the seat, he got, started scooting over me.
"Q. Did you try to get out? A. Well, I was already down in the seat then I couldn't very well get out. He was much stronger than I was.
"Q. Did you have any struggle with him at any time? A. I tried to struggle with him to get out.
"Q. Tell us how you tried to do it. A. I couldn't, but I tried to work my way out with my hands.
* * * * * *
"Q. I hand you what appears to be a pair of pants and ask you whether or not they were yours. A. Yes, sir.
"Q. Are you positive of that? A. Yes, sir, I am.
"Q. How did they happen to get soiled as they are now? A. He took them off of me and he laid them down at the end of the car, right by the seat. The car door was open. They got that way by the drizzling of the rain.
"Q. How did he get them off of you? A. Well, he held my hands back with one hand and got the pants off with the other.
"Q. Where was your head at that time? A. It was under the steering *811 wheel, by the steering wheel in the front seat.
"Q. And you are positive those are the pants you had on that day? A. Yes, sir, I am.
* * * * * *
"Q. After that act was completed what did he do? A. After the act was concluded he got up and he scooted over me once again to the other side of the car, under the steering wheel.
"Q. Then what happened? A. I got up and got my clothes back on and he drove me home."
On cross-examination the prosecutrix stated:
"Q. Did you after he stopped the car, did you cry out at all? A. Yes, sir.
"Q. How loudly did you cry out? A. About as loud as I could.
"Q. When the car went in there and stopped, you, of course, were sitting on the right hand side of the front seat? A. Yes, sir.
"Q. And he was behind the steering wheel? A. Yes, sir.
"Q. How did he get  or did he move his position? A. After he got me down in the seat he scooted over me.
"Q. Did he get out of the car? A. He opened the door and stood right next to me, against the door but as far as actually being away from the car, he didn't.
* * * * * *
"Q. You say that he pushed you onto the seat? A. Yes, sir, he leaned back onto the seat roughly with his hand, asked me to lay down and I wouldn't do it.
"Q. You also said that  did he hold you on the seat? A. He didn't hold me on the seat. He held my hand and got on top of me. That kept me there.
"Q. Did he pull your dress up? A. Yes, sir.
"Q. He did that? A. Yes, sir.
"Q. With one hand? A. With one hand, he had my other hand, held with his other hand.
"Q. Was he continually holding your one hand? A. Yes, sir, he was except when he was down on top of me, he didn't have my hand. That was when I was trying to make away but I could not because of his force being on top of me.
"Q. He pulled your dress up with one hand and I believe you also mentioned he took your pants off? A. Yes, sir.
"Q. Did you take your pants off or did he? A. He did.
"Q. How did he do that, with one hand? A. With one hand, yes, sir.
"Q. You say the car door on the right side was opened and he had stood up outside the car door before he pushed you on the seat? A. He put me on the seat then scooted over me and opened the car door.
"Q. And he got out? A. Yes, sir, stood right by the door.
"Q. You said he partially took his clothes off? A. Yes, sir, they were dangling from his feet.
"Q. His pants? A. Yes, sir.
"Q. They were never off his feet? A. No, sir, they weren't off. They were just dangling.
"Q. At the time this was going on it was daylight? A. Yes, sir.
* * * * * *

*812 "Q. About how long was this actual intercourse? A. Well, about fifteen or twenty minutes.
"Q. You were on the seat and he had penetrated you for about fifteen minutes? A. Yes, sir. During that time there was some struggle and everything but it lasted about fifteen or twenty minutes.
"Q. Did he at anytime have any sort of weapon, a knife or gun? A. No, sir.
"Q. Did he at any time threaten you with any weapon? A. He had once or twice started to take his hand, the back of his hand to hit me on the side of the face but he never did.
"Q. Did he ever say he was going to hit you? A. No, sir, he never did.
"Q. He did not threaten you? A. No, sir.
"Q. Mainly he just pushed you down? A. Yes, sir.
"Q. How did you say this soil got on here? A. All the rain and everything, they were down on the floor boards of the car, the door being opened, the rain came into the car.
"Q. There are no tear marks on these pants? A. No, sir.
"Q. They are not torn anywhere and no stains other than those caused by the rain and the dirt from the floor board, is that true? A. Yes, sir.
"Q. During the fifteen or twenty minutes you were there, did you at any time succeed in interrupting or forcing him to stop his penetrating? A. I tried but I didn't succeed.
"Q. Was his private parts in you during that time? A. Yes, sir.
"Q. When he got through with this he let you up? A. Yes, sir, he scooted back over me under the steering wheel; then I got up.
"Q. And you say you put your clothes back on? A. Yes, sir.
"Q. Did you get out of the car? A. No, sir, I didn't get out of the car.
"Q. You put your pants back on in the car? A. Yes, sir.
"Q. And straightened your dress? A. Yes, sir.
"Q. At any time when he let you up  and you say he scooted back  was the door still open? A. The right hand door was open. I shut it myself.
"Q. You sat there and closed the door? A. Yes, sir.
"Q. Was there any conversation at all about his taking you home before this happened or during the time it happened? A. As I sat at the bus stop he asked to take me home but that was the only time.
"Q. After this intercourse was finished did you ask him to take you home? A. Well, I asked him but when he got out to the road there I figured if he was taking me home 
"Q. I mean after the intercourse. A. No, sir he never mentioned anything about taking me home.
"Q. He just drove you home? A. Yes, sir.
"Q. From there he drove you to your house? A. Yes, sir.
"Q. Did you have any conversation with him on the way? A. No, sir, he just mentioned about why I wouldn't date him, he was talking about he didn't know why I wouldn't date him.
"Q. He wanted to date you? A. He mentioned about why I wouldn't date him.
"Q. Did you tell him why? A. He knew.

*813 "Q. Your parents would not let him? A. That's right
"Q. That was the reason? A. My parents always met the boys I dated. They wouldn't let me.
* * * * * *
"Q. What did he do then? A. He told me, said I am sorry that all of this happened. I got out of the car and slammed the door.
"Q. Did you say anything to him? A. Yes, sir, I told him good-bye.
"Q. You told him good-bye? A. Yes.
"Q. And shut the door and went in the house? A. Yes, sir."
Subsequently the prosecutrix was recalled to the witness stand by the State's Attorney, evidently to show fright or fear, and these questions were asked:
"Q. What were you frightened of when you tried to get out of the car? A. Well, because there is nothing around there except trees and a big body of lake.
"Q. What about the lake made any impression on you, was in your mind at that time? A. Well, I don't know what he could do with me with that big body of lake. I don't know what he had in his mind.
"Q. Were you frightened of him? A. Yes, sir, I was.
"Q. What caused you to be afraid of him? A. I don't know but he could throw me in there.
"Q. How frightened? To what extent were you frightened of him? A. Well, scared enough to try to get away but I didn't make it
"Q. You also explained when he was on you how you struggled and you explained again how much you struggled to get away from him. Do you mean after the car was parked? A. Yes, I struggled with my hands to try to push him away from me. He was already on top of me. Then I tried to push him away, but I didn't succeed.
"Q. You also explained about him throwing his hands. Explain that again. What did he do with his hands? A. He took the back of his hand, his right hand, took it right like that (indicating), he was going to hit me on the side of the face.
"Q. Did he ever hit you? A. No, sir, he never did.
"Q. How many times did he do that? A. Once or twice, I am not sure."
On re-cross examination of the prosecutrix the following appears:
"Q. Did he at anytime say anything to you about throwing you in the lake? A. No, sir, he never did.
"Q. Did he at anytime make any statement to you, a threatening statement? A. No, sir, he never did.
"Q. You said that he pushed you down on the seat then the door opened, he was on the ground and took his pants off? A. He put me on the seat and crawled on the seat to get to the door and opened it.
"Q. And his pants were down? A. Yes, they dangled.
"Q. At the time he took his pants down was he still holding you down on the seat? A. No, sir, he wasn't.
"Q. He let you go and took his pants down? A. Yes.
"Q. And you were still on the seat? A. Yes.
"Q. Lying on the seat? A. Yes, sir.

*814 "Q. Did you try to get up? A. I tried it once but he was standing by the door. I could not get out.
"Q. Did you try? A. I tried once to get up. He had my legs. I couldn't do it.
"Q. Had your leg? A. Yes, sir, after he was removing his pants, he still had his body against my leg, parts of his body against my leg at all times to keep me there.
"Q. And he was standing up on the ground? A. Yes, sir.
"Q. Was he standing straight up? A. Yes, sir.
"Q. You were lying there on the seat? A. Yes, sir.
"Q. How long did it take him  did he have underpants on? A. Yes, sir.
"Q. Did he take that off or take down both his pants and underpants? A. Yes, sir.
"Q. Were any buttons on his pants? A. Yes, sir.
"Q. How long did it take him to unbutton the buttons? A. Gee, not very long, I guess about two or three minutes, it wasn't very long.
"Q. You said before this happened about a block, I believe you said from that point? A. Yes, sir.
"Q. Did you do anything to resist him other than push his shoulder? A. No, sir, I didn't do anything else."
On redirect examination of the prosecutrix the following appears:
"Q. You answered Mr. Williams' question that you cried out as loud as you could?
"A. Yes, sir."
On re-cross examination of the prosecutrix, the following testimony was given:
"Q. Did you cry out before he took off his clothes or after? A. Before, when he first laid me down on the seat.
"Q. Then he let you go, took his pants off? A. Yes, sir.
"Q. You had already cried out before that? A. Yes. I cried out when he pushed me down on the seat.
"Q. Did you cry out again? A. No, sir."
The defendant testified that he picked the prosecutrix up and she was willing to go, that he drove out to Okeechobee Road, that he had loved her up in the show one time before, he denied he held the prosecutrix in the car by his hand, and then stated the following:
"A. I went down close to the lake and I parked  maybe this is a bad thing to say but I asked her to put out or walk. She told me she had to get home because her mother would soon get off from work and she agreed to it. I got out on my side of the car and walked around the car, which she said I crawled over her but I didn't do that. I walked to her side of the car and opened the door. Her dress got torn when she laid down.
"Q. Did you threaten her? A. No, sir, I ain't threatened her.
"Q. Did you ask her to have relations with her? A. Yes, sir.
"Q. Did you hit her? A. No, sir, she said I threatened to hit her with my hand, drawing my hand back, which I didn't do. She said I held her with the one hand and took my pants down with the other and that don't seem possible, which I didn't do.
"Q. Did you pull her dress up? A. Yes, sir.
"Q. Did you take her pants off? A. Yes, sir.

*815 "Q. Did she try to prevent you from doing that? A. No, sir, and she had on two pairs of pants, which they only have one in evidence, the other one I don't know where they are.
"Q. Did she resist you as you were having relations? A. No, sir.
"Q. After the intercourse was concluded could you tell the Jury then just what you did? A. Turned around, took her home. I was going to take her up to the front door and she told me to let her off in front of the Airport Dry Cleaners which she lives just back of there. She told me to let her out there. I was going to take her to the door."
The record does not disclose any denial or rebuttal testimony by the State to the statement of the defendant that he told the prosecuting witness "to put out or walk."
We think the testimony of the prosecuting witness fails to show sufficient evidence from which the jury was justified in believing, beyond a reasonable doubt, that she was forced and against her will to have intercourse with defendant. In addition thereto, there was lack of evidence sufficient to show such fear on the part of the prosecutrix as is necessary in order for the jury to find the defendant guilty of rape through fear.
In 22 Ruling Case Law, Section 10, page 1180, it is said:
"So resistance or opposition by mere words is not enough; the resistance must be by acts, and must be reasonably proportionate to the strength and opportunities of the woman. She must resist the consummation of the act, and her resistance must not be a mere pretense, but must be in good faith, and must be shown to persist until the offense is consummated."
In Section 12, at page 1182 of the same volume, it is said:
"No mere general statements of the prosecutrix, involving her conclusions, that she did her utmost and the like, will suffice to establish this fact of resistance, but she must relate the very acts done, in order that the jury and the court may judge whether any were omitted."
In Gullatt v. State, 80 Okla. Cr. 208, 158 P.2d 353, 354, it is said:
"While it is the law that a conviction for rape may be sustained upon the uncorroborated evidence of the outraged female, yet, it is equally well settled that the appellate court will closely scrutinize the testimony upon which the conviction was obtained, and, if it appears incredible and too unsubstantial to make it the basis of a judgment, will reverse the judgment."
In State v. Remley, 237 S.W. 489, 492, the Supreme Court of Missouri said:
"* * * The statements of plaintiff as to this occurrence must be viewed in the light of all the surrounding facts and circumstances. If the physical facts and all the circumstances appearing in evidence, together with the surrounding conditions, absolutely negative and destroy the force of such statements, then, in contemplation of law, such statements do not amount to any substantial evidence of the facts to which they relate. We do not mean by this that the prosecutrix must be corroborated, for such is not the law of this state. State v. Marcks, 140 Mo. 656, [41 S.W. 973, 43 S.W. 1095]. But we do hold that statements made by a witness that are not only in conflict with the experience of common life and of the ordinary instincts and promptings of human nature, but negatived as well by the conduct of the witness, and the conditions and circumstances surrounding the occurrence to which they have application, are not sufficient to support the grave and *816 serious charge of rape, and this is true whether the charge is made in either a civil or criminal proceeding."
In Mills v. United States, 164 U.S. 644, 17 S.Ct. 210, 211, 41 L.Ed. 584, the United States Supreme Court said:
"* * * in the ordinary case where the woman is awake, of mature years, of sound mind, and not in fear, a failure to oppose the carnal act is consent; * * * This is consistent, we think, with most of the authorities on the subject. See People v. Dohring, 59 N.Y. 374, and cases there cited. In the New York case it was held, after an examination and review of the cases, that if the woman at the time was conscious, had the possession of her natural, mental, and physical powers, was not overcome by numbers, or terrified by threats, or in such place and position that resistance would have been useless, it must also be made to appear that she did resist to the extent of her ability at the time and under the circumstance."
The failure of the prosecutrix to make an outcry may be significant. See Hensley v. State, 85 Tex.Cr.R. 260, 211 S.W. 590.
The conduct of the prosecutrix toward the accused after the alleged assault may be considered as bearing on the question of consent. State v. Roberts, 91 Utah 117, 63 P.2d 584.
In 3 Underhill's Criminal Evidence, Fifth Edition, § 757, page 1738, we find the following:
"It is so natural that a virtuous woman should immediately complain, to those connected with her by ties of blood or friendship, of such an outrage as rape that her neglect to do so is a circumstance which may discredit her. The failure to complain or delay in the making of a complaint, is therefore relevant evidence on behalf of the accused, although such evidence is not conclusive, and there may be a conviction even though the prosecutrix made no disclosure.
"The extent to which the failure to complain promptly should discredit the prosecutrix depends upon the circumstances of the case and the reasons for her failure. * * *"
In Section 758 it is stated:
"Since the prosecutrix' failure to complain raises an inference against her, the fact that she did complain may be admitted as a part of the government's case in chief. Such evidence may be received to negative the inconsistency of silence, or it may in proper cases be admissible as part of the res gestae. The distinction is important.
"Where the complaint is not a part of the res gestae of the crime but is admissible to rebut the adverse inference from silence, only the fact of the complaint, together with the time when and the name of the person to whom it was made, is admissible on direct examination  the details of the complaint are not, and, in particular, the name of the alleged offender may not be proved on the examination in chief. That the complaint must be made soon after or within a reasonable time after the attack is held by a few cases and implied by many; Professor Wigmore feels that any delay in making complaint should go to weight but not to admissibility. * * *"
In Section 765 of the same volume, with reference to fear, it is stated:
"The woman's resistance may be overcome by threats as well as by force. Such threats must place her in fear of death or great bodily harm, or they must inspire a fear so great that she dares not resist. It is not necessary that a threat be expressed in words.
"From proof of the woman's silence at the time of the alleged commission of the crime, taken in connection with *817 evidence of her mature age and general intelligence, the jury may be justified in the inference that she consented to the intercourse. But her silence is always open to explanation. Hence, her evidence explaining and giving reasons for her silence, as for example, where she testifies that she did not make an outcry because she was gagged or choked by the accused, or because she was terrified by his threats, or because she was unconscious, must always be considered by the jury in determining the evidential value of her silence. It is not necessary to prove that her screams were heard by every person who was within earshot. The clothing of the prosecutrix, an infant, properly identified by her mother, is competent to show the force employed, which may be inferred from their torn condition."
Both the state and the defendant comment on the case of Jackson v. State, decided by this court, the opinion of which appears in 107 So.2d 247. The facts in Jackson v. State are so different that we do not believe it is in point for either the state or the defendant. The prosecuting witness in the Jackson case testified that she got out of the truck and tried to get away but that the defendant caught her and threw her back on the seat of the truck. She further stated that she placed her hand on the horn of the truck and blew it; that she screamed and begged the defendant not to rape her; that she showed him a cross she was wearing; and that she explained to him that she was old enough to be his mother. She finally escaped from the defendant, hurried to the main highway where she stopped a car occupied by two persons and asked them to take her to a service station where the police were immediately contacted, and who subsequently appeared as witnesses in the case. Furthermore, the prosecutrix received injuries to her wrist and arms, her forearm, bruises on her back and between her legs. But in the instant case, there was no evidence of physical injury, which fact coupled with the insufficient evidence of force, renders any comparison of this case to the Jackson case ineffective to the contentions of either party before this court.
We do not deem it necessary to pass on certain other questions posed by the appellant since this case must be and is reversed for a new trial.
KANNER, J., and STEPHENSON, GUNTER, Associate Judge, concur.