## DONALD McLAURIN v. STATE.

No. A-5955. Opinion Filed May 29, 1926.
(246 Pac. 669.)

John L. Gilson, for plaintiff in error.

George F. Short, Atty. Gen., and Smith C. Matson, Asst. Atty. Gen., for the State.

DOYLE, J.  In this case, the information filed in the district court of Texas county charged that in said county, on or about the 7th day of April, 1925, Donald MacLaurin, did then and there feloniously, and by force and violence overcoming her resistance, rape, ravish, and accomplish sexual intercourse with Mabel Pittman, a female person of the age of 19 years, and not the wife of said defendant.

On the trial the jury returned a verdict finding defendant guilty as charged in the information, but were unable to agree on the punishment. Motion for new trial was duly filed and overruled, and on September 23, 1925, the court rendered judgment, and sentenced defendant to imprisonment in the penitentiary for a term of 15 years. He has appealed from such conviction to this court, and, being unable to give bond, the cause, under the rules of the court, was advanced.

To properly determine the questions presented on the errors assigned and relied on for a reversal, consideration of the evidence will be necessary.

It appears that the prosecutrix was a student at the state school at Goodwell; that she was the foster daughter of J. T. Pittman and wife, of Ellis county, of whose family she had been a member for about 12 years; that, while attending college, she worked for her board and room at the Cox Hotel.  The defendant was 31 years of age, an overseas soldier, and employed as a telegrapher for the Rock Island Railroad at Goodwell, and had boarded at the Cox Hotel.

The testimony of the prosecutrix was to the effect: That defendant told her that Sunday morning that the law was after her for taking a little girl under the age out the Friday evening before.  That he was a secret

service man, and could help her, and, if she would trust him, he would protect her and take her to Mr. Albright's to stay for a couple of days, and everything would be all right, and she could come back to school and she consented to go with him. He was to get a car from some one, and they went to the drug store together. After waiting a while, he went out and came back, and said the fellow had backed out, and they could not get his car. Then he borrowed an old Ford car from a Mexican, and they drove to Albright's. Defendant talked to Mr. Albright and handed him some money, got back in the car and drove to Mr. Albright's brother-in-law's and there filled the radiator, then drove back to Albright's and asked Mr. Albright, "Where is it?" Mr. Albright answered, "Right by the telephone pole." Then he drove on aways, stopped, got out of the car, and went to a telephone pole, picked up a bottle, and put it in the car; then drove on to a house, stopped there, and got some matches and a drink of water; then started back and stopped at a vacant house. There he took the cushion out of the car, and put it on the porch, and asked her to come and sit on it. That she sat down a few minutes; then walked around the yard. Several cars passed by, and he told her to go in the house, and said he would stay on the outside. That he came in the house, and asked her to sit down and talk this thing over, and she sat down by him. He put his arms around her. She told him not to do that. He said he just wanted to love her. Then he pushed her over, and got on top of her. That she fought him, and tried to get up, and started to scream, but he put his hand over her mouth and choked her. That she had on extra cloths, as her menstrual period was on. That, after defendant had accomplished his desire, he kissed her. Seeing a man pass the window, she said "There is a man," and defendant said, "I will kill him or you one," and picked up a rock and went

out on the porch. That she got up, and went to the door, and saw the man across the road from the house. Then defendant asked her to go back to town with him, and she told him that she would not go back to town in that shape, so they got in the car and started away. They saw a car coming, and he stopped and took the bottle out of the car and put it by a fence post, saying that he did not want any one to find that on him or in the car, and, while he was working on the car, another car came by with Mr. Albright and another man in it. Defendant said, "What do you know?" Mr. Albright answered, "Not much of anything." Defendant got in the car, drove passed Mr. Albright's and stopped at another house, talked to a man, and brought her a drink. Then they went on down to the river. There he took a cushion out of the car and put it in the shade of a tree and asked her to sit down by him and talk it over. That, thinking she could gain his confidence and find a way to get away, she sat down. Then he wanted her to lay down with him, and she would not do it. Then she walked around and went back and again sat down by him. He said he heard some voices, and got up, looked around, and walked off a little ways, and she went to the car, and laid down in the seat so he could not see her. That he went and laid under the tree, and she got out, cranked the car, and drove across the pasture to a ranchhouse, and there asked the way to Spearman; then drove on as directed, and stopped at a house to put water in the car. A woman there asked her what her name was, and she told them her name was "Carrol," and asked the way to Spearman. That she drove on to a place about 15 miles north of Spearman, and had to stop again to put water in the car. A young man came to the door. He told her he was a bachelor, and asked her what she was doing and she said, "Doing as I please," and he said, "Don't you want to come in and stay with me a little while," and she talked a while,

and finally said, "I am just running away from what you asked me to do just then." Then he carried water to the car, and asked her why she didn't go home to her mother, and she said, 'That is where I am going." He said, "That old car will not take you to Spearman. If you will trust me, I will take you there." She said, "All right," and they got in his car, and he drove to Spearman. That she stayed at the hotel, and registered as Blondy or Mabel Pittman. That she is generally known as Blondy. That the next morning she sent a telegram to Mr. Cox that she was going home, and not to worry about her, and sent a telegram to Mr. MacLaurin that she was going to California, and he would find the car 15 miles north of Spearman. That she took the morning train for Shattuck. That, after eating dinner there at a cafe, an officer came in and said: 'Is your name Pittman? The sheriff at Arnett has asked me to hold you until he gets here. It seems that you have run away from school," and she said, "I had a right to." That she telephoned her mother to meet her at Gage. The sheriff took her on to Gage, and there turned her over to her mother. That she told her mother about it, and then went on home.

W. A. Albright testified that he saw defendant and the prosecutrix at his farm three miles and a half due east of Goodwell about 1 p. m. Defendant wanted water for the car, and he sent him down to his brother-in-law's to get water; that about 4 o'clock p. m. he saw them the second time west of his place in the road and talked to defendant; that her arms looked sunburnt, and he did not notice any marks or bruises on her hands and arms.

Mrs. J. T. Pittman testified that she lived in Ellis county; that the first time she saw her foster daughter after she went to school at Goodwell in the summer of 1924 was at Gage on the 8th day of June; that she saw

bruises on her body, a swelled place under the jaw, and some scratches on her hands and arms.

A. C. Lathrop testified: That he saw defendant and a girl with him at his place about 8 miles from Guymon Sunday afternoon about 1 o'clock, and defendant asked for and he gave him some matches. That about 4 o'clock he noticed a car standing quite a while before the house on the next quarter. That he walked past the car to the house, and, as he passed the window, saw the girl in the house. She said something he did not understand. As he walked back across the road, defendant came out on the porch. That the girl was lying on what he took to be a car cushion. That a half hour later they stopped at his house, and defendant got a drink and took a drink to her.

L. E. Latham testified: That he has been in the dry goods business at Guymon 20 years, had a pasture south of town, was down there with Carl Smith, Bud and Daddy Meed and Mrs. Meed, and the prosecutrix drove up in an old Ford car, and wanted to know the way to Spearman. That the ladies were in the house, and the men out in the yard. That he told her the way, and she got out and cranked the Ford herself, and he remarked, "You can crank a Ford," and she said "I can do anything." He was then asked, "Did you observe any marks of violence on the lady's person?" and answered, "Nothing that I thought was violence. Her neck was red, and looked as though it was sunburnt. We have a swimming pool in the pasture, and I thought probably she had been swimming and was sunburnt." That a few days later she was in the store, and he asked her, "Did you get home all right?" and she said, "Yes; you are the man who directed me."

When the state rested, the defendant demurred to the evidence, and asked the court to instruct the jury

to return a verdict of acquittal, which the court refused to do, and allowed exception.

As a witness in his own behalf, the defendant testified: That Sunday June 7th Miss Pittman called up and told him she was in trouble; that Marshal McIntyre had run her out of the elevator office, and had reported her to Prof. Fanning, and she wanted to leave; that 11 o'-clock he went up to the hotel, and she told him she wanted to go to Spearman. They went together to the drug store, and he tried to persuade her not to go. Then he borrowed a car from a Mexican who worked on the railroad, and with her drove out to Mr. Albright's. He directed him where to get water for the car, and he drove there. Then he drove to Lathrops. There he got same matches and a drink; that it was hot, and the Ford did not have a top, and they stopped at a vacant house, sat on the porch and talked, then went into the house. She finally decided she would go back. That after they started back, she changed her mind, and said she wanted to go home. Then they went over to Lathrops again, and there he brought her a drink. That the next stop was down by the creek. There he told her that he had to go to Dalhart in the morning, and would have to get back. That, if she had to go home he would have the car brought back from Spearman. That she went on, and he started back. That he found the Mexican badly worried about his car, and told him not to worry, that he would have it brought back. That he was arrested the next morning, went over to the depot, and received a telegram from Miss Pittman telling him where she had left the car, and that she was going to California. That he did not have sexual intercourse with Miss Pittman on that trip or any other time.

Two or three witnesses testified that they talked with defendant that evening, and that there were no

stains of any kind on his clothes, the same he was wearing when he left town about noon that day.

Defendant offered to prove by O. B. McDaniels that he had a conversation with defendant about 11 o'clock wherein defendant asked him if he could take him and Miss Pittman to Spearman that afternoon, and that witness agreed to take them, but shortly after was called to Stratford.

The court excluded this evidence, apparently on the theory that it was impeaching evidence. In this we think the court was in error. The evidence offered was not of contrary statements, but of facts tending to disprove the statement of the prosecutrix that defendant had agreed to take her to and leave her at Mr. Albright's for a few days.

Defendant offered to prove by A. C. McIntyre, city marshal of Goodwell, that he found Mabel Pittman, better known as Blondy Pittman, with a man named Weatherby in the Equity Elevator office about 9 o'clock at night, and made her go to the Cox Hotel, and that he reported her conduct to President Fanning of the Goodwell College.

Defendant offered to prove by A. W. Fanning, president of the college of Goodwell, that City Marshal McIntyre informed him the next day that he had found Miss Pittman in the elevator office south of the railroad in Goodwell, and that he had ordered an investigation.

The court sustained the state's objections, and excluded this evidence.

We think the evidence offered was competent as tending to disprove facts stated by the prosecutrix. She had testified that she was induced to go with defendant to avoid arrest for some similar misconduct. The evi-

dence offered was of acts tending to show that she expected to be expelled from the college for such misconduct, and was both willing and anxious to leave Goodwell to avoid such investigation.

The main question presented is whether the evidence was sufficient to warrant a conviction. It is true that this court has held many times that there is no rule of law which forbids a jury to convict for the crime of rape on the uncorroborated testimony of the prosecutrix, provided they are satisfied beyond a reasonable doubt of the truth of her testimony. It does not follow, however, that a conviction upon such testimony is to be arbitrarily sustained under all circumstances. In some states, corroborating evidence is required by the stateute.

It is true that convictions for rape must rest largely upon the testimony of the prosecutrix, and direct corroborating testimony is well nigh impossible to procure. However, where the charge is true, there will almost always be some corroborating evidence, such as injury to the person or clothing of the prosecutrix, or the fact that she made complaint as soon as practicable, and without unreasonable delay, and it is always legitimate to consider whether the subsequent conduct of the prosecutrix is the usual and natural conduct of an outraged woman as bearing upon the credibility of her direct testimony.

In Wines v. State, 7 Okla. Cr. 450, 124 P. 466, we said:

"It is the natural impulse of every honest and virtuous female to flee from threatened outrage, and, if assaulted, to make complaint at the first opportunity, and, where this is not done and no reasonable explanation is made, it is a strong, but not a conclusive, presumption against the truth of the accusation.

"By prompt disclosure the injured party is thereby

shielded from unjust inferences and society guarded in a measure against the possible machinations of designing and evil-minded females."

In this case the testimony of the prosecutrix should be considered in the light of all the attending circumstances. These are few, and perhaps not very significant. Nevertheless, we think they cast so much doubt upon the credibility of her testimony that the conviction should not be permitted to stand. The testimony of the prosecutrix is inconsistent and contradictory, and her subsequent conduct is wholly inconsistent with her direct testimony.

Our Penal Code, § 1834, subsec. 4, defines rape as an act of sexual intercourse, accomplished with a female, not the wife of the perpetrator, "where she resists, but her resistance is overcome by force and violence." All the authorities are agreed upon the general principle that force is an indispensable element of the crime of rape. Her testimony as to force overcoming her resistance is wholly uncorroborated by a single circumstance, such as injury to her person or clothing, if we exclude the testimony of her foster mother.

At least three disinterested witnesses for the state testified that they observed her that afternoon after the alleged crime was committed, and noticed nothing unusual in her appearance or of the condition of her clothes. Her subsequent conduct in the sending of a telegram to defendant the next morning is wholly inconsistent with her direct testimony, and gives rise to a very strong suspicion that this prosecution was prompted by ulterior and unexplained motives. Her subsequent conduct cast so much doubt upon her credibility that we cannot permit the judgment and sentence in this case to stand. This conclusion renders it unnecessary to consider the other questions in the case.

The judgment appealed from is reversed and the cause remanded, with direction to dismiss.

BESSEY, P. J., and EDWARDS, J., concur.