Mack HUTCHINSON, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12082.

Criminal Court of Appeals of Oklahoma.

Jan. 5, 1955.

Hall & Graham, Tulsa, Oerke & Crane, Lawton, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., Manville Redman, Jr., County Atty., and Arthur L. Cavanaugh, Asst. County Atty., Comanche County, Lawton, for defendant in error.

POWELL, Presiding Judge.

The plaintiff in error, Mack Hutchinson, who will hereinafter be referred to as defendant, was charged by information filed in the Superior Court of Comanche County with the crime of rape in the first degree, was convicted and his punishment fixed by the jury at imprisonment in the State Penitentiary for a term of fifty years. Appeal has been duly perfected to this Court.

While some eight assignments are set forth in the petition in error, such assignments are argued in the brief filed by counsel under two propositions:

(1) That the proceedings were irregular, because the accused was not properly arraigned; and, (2), That the verdict is not sustained by sufficient evidence, and is contrary to law.

While counsel in the lower court does not represent the defendant in the within appeal, we observe by study of the record that in the trial he was most astute in the cross-examination of the State's witnesses and in the presentation of evidence for his client, and his effectiveness is shown by the fact that the jury assessed a penalty of fifty years, where the punishment might have been death. Tit. 21 O.S.1951 § 1115. This statement is made at the outset by reason of complaint in the brief on appeal that trial counsel was a court-appointed attorney and failed to have preserved in the record certain remarks alleged to have been made by the county attorney in his argument to the jury, and now said to have influenced the minds of the jurors and presumably caused them to disregard the testimony in the case. This will be hereinafter considered.

The record discloses that the defendant was a negro soldier stationed at the time at Fort Sill, and that the alleged victim was Mrs. Wanda Kuykendall, apparently a girl of Spanish descent, the seventeen-year old wife of a white soldier also stationed at Fort Sill. The woman was the mother of a three-weeks old baby, and had resided in Comanche County only one week.

It is of course incumbent upon courts in any situation, and particularly in a situation as here, where prejudice may easily influence the deliberations of a jury by reason of the heinousness of the crime charged, regardless of the race of the accused, to make every effort to see that the outcome is based solely on competent testimony presented, and uninfluenced by any matters prejudicial to a fair and impartial consideration of the issues involved.

Considering first the question as to irregularity in arraignment, while the question is not a jurisdictional one, and has been raised for the first time on appeal and ordinarily would not for such reason receive treatment, we shall by reason of the nature of this case, give the issue notice.

The minutes of the clerk of the trial court show that defendant was present in person and by his counsel, Mr. Lewis F. Oerke, and waived the reading of the information and time to plead, and entered a plea of not guilty.

On appeal it is now asserted that "the waiver of the reading of the information in a capital case violates a substantial right of the defendant to know the exact nature of the offense of which he is charged."

It is thus inferred without actual allegation to that effect, that the defendant did not know the nature of the charge that he was called upon to answer. No authority is cited in support of the proposition raised. We feel sure that most counsel with experience in the trial of cases can visualize many instances where it would be much preferred that the information not be read. Any attorney vigilant in his duties would have a copy of such information, and prior to arraignment would pretty well have in mind his strategy. The record would indicate that such was the situation in this case, for it appears that prior to this arraignment defendant had been accorded a preliminary hearing before an examining magistrate and his counsel who appeared with defendant at the time of his arraignment in the Su-

perior Court represented him at such preliminary hearing. There the prosecutrix and other witnesses had testified.

The statutory provision pertinent to a consideration of the issue in question is Tit. 22 O.S.1951 § 465, which reads:

"The arraignment must be made by the court, or by the clerk or county attorney, under its direction, and consists in reading the indictment or information to the defendant, and asking him whether he pleads guilty or not guilty thereto."

The statute involved was adopted from Comp.Laws Dak.1887, § 7277, and first appears as Stat.1890, § 5539, and the annotation under the present quoted section sets out the historical development.

In 1910 Presiding Judge Furman of this Court in Wood v. State, 4 Okl.Cr. 436, 112 P. 11, 45 L.R.A.,N.S., 673, treated in some detail the principles involved in the question raised, and reference may be made to that case.

The Supreme Court of Oklahoma, prior to the establishment of this Court, held in Shivers v. Territory, 13 Okl. 466, 74 P. 899, that a defendant who is present may, on arraignment, waive the formal reading of the indictment and enter his plea. And in Fuller v. State, 70 Okl.Cr. 408, 106 P.2d 832, 833, we said:

"The accused in a felony case is always entitled to an arraignment and plea before his trial; however, this is one of the rights of the defendant which may be waived by him.

"Where the defendant announces ready and proceeds to trial without objection, he thereby waives his right to an arraignment and plea."

See also Scroggins v. State, 91 Okl.Cr. 428, 219 P.2d 636; Gardner v. U. S., 5 Ind. Ter. 150, 82 S.W. 704; Hast v. Territory, 5 Okl.Cr. 162, 114 P. 261; Spencer v. State, 5 Okl.Cr. 7, 113 P. 224; People v. Sprague, 53 Cal. 491.

The problem now is to determine whether or not the verdict is sustained by sufficient evidence, and particularly in respect to the identification of the defendant.

Counsel call our attention to the oft repeated principle that in this State while a conviction for rape may be had on the uncorroborated testimony of the prosecutrix, that when her testimony is contradictory, and the defendant testifies and denies specifically the testimony of the prosecutrix, and his testimony is corroborated, the testimony of the prosecutrix standing alone, is not sufficient to warrant a conviction. Counsel cite Morris v. State, 9 Okl.Cr. 241, 131 P. 731, 735; Ferbrache v. State, 21 Okl.Cr. 256, 206 P. 617; and Witt v. State, 29 Okl. Cr. 357, 233 P. 788. See also Maxwell v. State, 78 Okl.Cr. 328, 148 P.2d 214, 217; De Witt v. State, 79 Okl.Cr. 136, 152 P.2d 284, 289.

In the Maxwell case it was said:

"This rule has more often been applied in cases where the prosecutrix is a child of tender years and more susceptible of coming under the influence of others, or through fear, threats, coercion or duress." (Citing cases.)

Counsel then asserts the necessity of corroboration in this case, and claims that the evidence in corroboration of the testimony of Wanda Kuykendall is insufficient, and that such proposition is supported by application of the principles adhered to in such additional cases as Johnson v. State, 52 Okl.Cr. 397, 5 P.2d 722; MacLaurin v. State, 34 Okl.Cr. 324, 246 P. 669, and Gullatt v. State, 80 Okl.Cr. 208, 158 P.2d 353, 354.

In the cited case of Gullatt v. State, supra, the rule is stated this way:

"While it is the law that a conviction for rape may be sustained upon the uncorroborated evidence of the outraged female, yet, it is equally well settled that the appellate court will closely scrutinize the testimony upon which the conviction was obtained, and, if it appears incredible and too unsubstantial to make it the basis of a judgment, will reverse the judgment."

Contrawise, we said in Roberts v. State, 31 Okl.Cr. 103, 237 P. 148; and Lane v. State, 48 Okl.Cr. 84, 289 P. 357:

" 'In a case of statutory rape, where the evidence of the prosecutrix is not inherently improbable or contradictory,

it is not essential to a conviction that there be corroboration.' "

Illustrative of where the evidence was deemed insufficient are the cases of Louis v. State, 92 Okl.Cr. 156, 222 P.2d 160, involving an Indian and his white step-daughter; De Witt v. State, supra, and cases cited therein. Also cases where the evidence was held sufficient were such cases as Epley v. State, 94 Okl.Cr. 308, 235 P.2d 711; Kidd v. State, Okl.Cr., 266 P.2d 992; and Henderson v. State, 94 Okl.Cr. 45, 230 P.2d 495, 23 A.L.R.2d 1292. In the last mentioned case the sole question was as to the sufficiency of the identification. The death penalty assessed was modified to 150 years in the State Penitentiary.

With the above principles in mind, as applied to the facts in the cases heretofore cited, we proceed with a consideration of the evidence in this case.

The act in question is alleged in the information to have occurred in Comanche County on Friday, May 29, 1953, in that the defendant "did, then and there unlawfully, wrongfully, and feloniously without her consent and against her will, by means of force and fear overcoming her resistance, rape, ravish and carnally know her, the said Wanda Kuykendall, contrary to the form of the statute" etc.

We have carefully studied the evidence and the only feature of testimony of the prosecutrix that would require corroboration is as to the identity of the defendant. She did not immediately identify the defendant as being the person who ravished her when he was first taken to the hospital where she was undergoing treatment after the alleged rape, and she also failed to identify him at the police station just after her discharge from the hospital.

Wanda Kuykendall testified that in May, 1953 she lived at 22½ D Street, Lawton, having moved there on May 22; that her husband was a soldier stationed at Fort Sill, which adjoins Lawton; that her husband was not able to be at home every night by reason of his military duties. She stated that on the night of May 28 she was keeping her landlady's two little boys and put them to bed at 11:00 P.M., and that

soon thereafter she went to bed, her three-weeks old baby sleeping with her. She was 17 years of age. That the same night or early the next morning she was awakened by someone scratching on the screen to her door. She lived on the alley to the rear of her landlady's apartment building, which was on D Street. That on hearing the noise she asked who was there, and a voice answered, "Your Husband". She then opened the door and saw a negro there, who told her that her husband was in jail. She stated that she then asked: "What did he do?" and that he answered: "He got drunk". She stated that the man had continued to work with the screen and was cutting it with a knife and she tried to fasten the main door, but the negro ripped open the screen door and kept her from fastening the main door, and he forced his way into the room and grabbed her. That she screamed and fought him, but he tore off her gown and said to her: "Scream again and I will kill you"; that he still had the knife in his hand; that he threatened to kill her baby if she did not submit to him, but that she kept fighting him and that he hit her and knocked her down, and then dragged her over to the bed and forcibly had sexual intercourse with her.

Witness stated that the defendant ravished her and then got her by the arm and forced her outside the house, saying, "If I let you go you will tell on me"; and she then begged him to let her go back inside and get some clothes on and get her baby. That she put on a dark blue skirt and a light blouse, but was unable to dress the baby and wrapped him in a blanket. That her attacker came back in and took some money that she had on the dresser and wanted to know if that was all she had; that he then forced her out of the house and around the apartment building to D Street, where he took the baby from her and told her to look in a car and see if the keys had been left in it, and she could not see and told him that there were no keys and that he then said, "Come on", and made her walk on down the street; that they crossed D Street and went up First Street to C; that when a police car

passed he told her if they stopped to tell them that she was his wife; that he at all times had the knife in his hand; that a car was coming and he whistled and the car went past but was turned around and driven back and stopped close to the sidewalk; that she saw one man in the car, and heard the driver ask the man with her if he was going back to the post and he said, "In a minute when I get through talking to my wife"; and that the man in the car drove on. She said that she did not hear all the conversation between them. She testified that after this she was made to walk up to the alley between C and D Streets; that the man was saying something about a taxi and that they walked back the way they came, and when they got back down to First and C Streets a car stopped. That it was a black car and her ravisher went over to talk to the men in that car, and that at this moment a taxi pulled up from "down" C Street. She further testified:

"Q. Did you have any conversation with the man who was in the cab that you recall? A. He stopped and asked me if I was in trouble.

Q. Did you make any reply to him? A. Yes.

"Q. Do you recall what you said, after that occurred, what did you do? A. I got in and asked him to take me to the police station.

"Q. You got in the cab? A. Yes.

"Q. What happened to the man that was with you? A. He got in the car he was talking to.

"Q. He got in the other car? A. Yes."

Witness said there were men in the front and back seats of the car her ravisher got in, but she was unable to tell how many.

Witness stated that the taxi driver took her to the Lawton police station and she was then taken to the Fort Sill Army Hospital, where she stayed for five days. Witness stated that the man who was with her during the time stated was a colored man, dressed in khaki trousers, dark shirt and white "T" shirt showing at the throat; that he had a mustache, was of medium build and not very tall; that it was 4:30 A.M. when she got to the hospital. She further testified that when her baby was born she had difficulty and the doctors had to take some stitches in her sexual organs, and that when she was raped all the stitches were broken loose and she lost a quantity of blood and the doctor gave her a sedative by reason of this, and by fact of her nervousness.

Witness further testified that while she was at the hospital fifteen or twenty men were brought to her room to see if she could recognize any of them; that after she got out she did identify the man who raped her, and whom she said was the defendant there in the courtroom. She said that the Army C.I.D. people showed her a number of pictures, that one she saw looked like the man who broke into her house and raped her; that later at the C.I.D. office five men dressed in army clothes each holding a large number in his hand were shown and they were required to talk and that she identified the man bearing number 5 from his appearance, and talk, and later learned his name and that he was the defendant then being tried.

On cross-examination the prosecutrix stated that while standing at a building on First Street and an alley a police car passed along the street twice. She said that the defendant was among those brought to the hospital while she was there, and that he was brought to the police station soon after she was discharged from the hospital, but that she would not say he was the man until she saw him in the C.I.D. line-up and heard him talk. She said that two C.I.D. officers, one white and one colored, had talked with her and gotten a description of her assailant. She denied that anyone at any time tried to influence her into picking out any particular man as being the one who raped her.

Reatha Blackmon testified that on May 28 and 29 she lived at 208 South First Street, Lawton, which was between B and C Streets. She said that in the early morning of May 29 she was awakened by a woman's scream; that her daughter lived back of her house and she thought it was her daughter screaming and went to her back door to look out, and then went to the front

and went outside; that her house was between the Casalina and another house; that after going out the front she noticed a man and girl standing across the street in the alley; that the man was colored and the girl looked like a Spanish girl and was holding a little baby wrapped in a blanket, and she estimated that it was 4 or 5 o'clock in the morning; that the girl and man walked down First Street toward C Street and stopped at the corner; that a car drove up and a cab drove up and the man got in the car and the girl in the cab. She said that later on in the morning she was called to the police station and identified the man whom she saw in the alley with the prosecutrix. This witness then pointed out the defendant in the court room. She also testified that she saw two police cars pass while the man and girl were standing in the alley. She said defendant had on a pair of khaki pants, and a blue sport shirt with cuffs turned up; that the parties seemed to be laughing and talking like sweethearts; that the cab and the car drove up about the same time, defendant getting into the car and the girl in the cab. She identified the prosecutrix as being the girl. Witness further stated that she did not know what had happened but the next morning at 10:30 she was taken to the police station and identified the defendant.

Delbert Ritter, a taxicab driver for the Yellow Cab Company in Lawton, testified that between 2:30 and 3 o'clock on the morning of May 29, 1953, he was cruising around, looking for passengers, going east on C and saw a young woman walking down First Street with a baby in her arms, and a colored man walking about two yards behind her. That when he first noticed them they were going south on First Street, a few yards from the intersection of First and C. He stopped and asked the girl if she wanted a cab, and she "excited like" answered, "No, but he does". Witness asked if she were in trouble and she answered "yes", and he told her to get in the cab. She ran around the front of the cab and got in, and "scooted low". That the colored man stopped when witness stopped his cab, and just as the girl got in the cab a black 1948 Buick going south on First

Street pulled around the corner and stopped a few yards from the cab and the man got in, and they drove off, going west on C. He testified that the woman was hysterical, and witness asked if she were in trouble and drove a block and a half before he could get any information from her. In answer to his question, she admitted that she had been attacked and immediately through his car radio he called his dispatcher and asked him to call the police, giving a description of the car. Later witness saw the same black Buick automobile he had seen at First and C Streets in front of the police station. Witness stated that he could not tell how many people were in the Buick, but he knew there were two in front, and two in the back seats. That he could not make out the features of the persons in the car.

On cross-examination this witness stated that the colored man in question never did leave the sidewalk until the Buick pulled up almost identical to the time witness drove up. He said the girl "broke and ran when I asked her if she was in trouble to get in the cab."

Witness was asked if he heard any conversation between the man and the persons in the black Buick, and he answered: "The only conversation was he turned and looked in the car. I was trying to find out the score. I knew something was wrong. And one of them said: 'Let's go' real excited like, and they took off." He further said that he thought the young woman was of Spanish descent.

Herman Jones, a colored soldier stationed at Fort Sill, testified that on the night of May 28, 1953 he passed through Lawton, going to Vernon, Texas, and in the early morning of May 29th returned through Lawton. That as he came back through Lawton he saw Mack Hutchinson, the defendant, standing on the corner across the street from the Casalina with a "light skinned woman", and that the woman was holding a baby. That defendant whistled as he passed, and witness made a "U" turn and went back, and that defendant "explained to me. He asked me was I going to camp, and I told him I was and had a couple of more boys to pick up and take back

with me, and I would come back and pick him up." He testified that defendant stated that he "had something else to tell his wife, or girl friend, or something."

Witness on further examination, and particularly on cross-examination, commenced to hedge as to positive identification and claimed that he identified Hutchinson mainly by the way he was dressed when he saw him at the C.I.D. "show up"; but it was brought out that defendant was dressed in army fatigues when he identified him, which was different from the way he was dressed the night of May 28 and morning of May 29, 1953.

It developed that witness had made a statement to the C.I.D. officers. For purpose of impeachment the court permitted the witness to be questioned concerning the signed statement:

"Q. Weren't you asked these questions, and didn't you give these answers: 'Question: Have you seen this man since that night? Answer: No. Question: What about today? Answer: Yes, I saw him today in the office of the 31st C.I.D. Question: You know this is a sworn statement? and you swear this is the same man who was on the street that night with the woman who had the baby in her arms and there's no doubt? Answer: This is the same man. There is no doubt whatsoever. I am positive.'

"Q. Didn't you you make this statement? A. I am not positive I made those exact words.

"Q. Isn't this your signature on that statement? (Hands paper to witness). That is your signature, is it not? A. That is right.

"Q. This was also made June 11, 1953, was it not? A. Yes, sir.

"Q. You stated on this date: 'I was requested to look at a white woman at the Lawton Police Department to see if I could identify her or if I knew her. I carefully observed this woman and identified her as the woman I saw at First and C Avenue, Lawton, Oklahoma, holding a baby in her arms on May 29th, 1953. I have no doubt this is the same woman.' A. That's the answer I said?

"Q. At preliminary hearing after talking about the incident you talked about in the same statement: Question: 'Is that man in the courtroom this morning? Answer: He is. Question: Where is he? Sitting behind his attorney? Answer: Yes. Question: That's the same man you talked to that particular night? Answer: Yes. Question: Was anyone else with him? Answer: A woman. Question: Anyone else? Answer: A baby. Question: Have you seen that woman since that time? Answer: Yes, I have. Question: Is she the same Mrs. Kuykendall you have seen in the court room this morning? Answer: That is right.'

"Q. Did you give that testimony at the preliminary hearing? A. Yes, I did.

"Q. Further, on cross-examination, didn't you give this testimony: Question: 'When they first talked to you about this, did you at that time know this boy here? Answer: No. Question: Had you ever seen him before? Answer: The only time I saw him was that night. Question: He's not in your outfit? Answer: No. Question: Did they ask you about him when they first talked to you? Answer: What do you mean by that? Question: Did they ask you if you knew Hutchinson? Answer: . Yes. Question: Did they have his picture? Answer: I never did see his picture. Question: When did you first see him? Answer: On the night of the 29th. Question: When was the next time, in the line-up? Answer: When they brought me over to the C.I.D.'s. Question: When? Answer: I say about two days after or three days after. Question: Two or three days after they brought you over to the office? Answer: Right. Question: Was he over there? Answer: Yes. Question: How many other boys were there? Answer: About four. Ques-

tion: How were they dressed that day? Answer: In fatigue clothes.'

"Q. Weren't you asked those questions by Mr. Oerke at the preliminary hearing and didn't you give those answers? A. That is right.

Witness further admitted that since signing the statement other colored people had talked to him about his testimony.

Dr. Richard B. Hunter testified that on the morning of May 29, 1953 he was the medical officer at the station hospital, Fort Sill; that at about 3:30 to 4:15 he had occasion to examine Wanda Kuykendall; that he examined her sex organs and said he: "My observation was there was evidence of lacerations and tearing in the vaginal region. The extent thereof I did not determine, but it was obvious appreciable laceration was present." Witness further testified:

"Q. Did you detect the presence or absence of an episiotomy? A. An episiotomy is a laceration performed purposely at the time of birth to aid a young woman having her first child, due to the very tight physical exit, any young woman having her first child it is a cut to widen the exit for the child to pass through. It is very lengthy in extent but immediately after the surgery it is sewed up.

"Q. Without attempting to say when the episiotomy was performed, you did detect the presence of such an operation having been performed on this woman some time prior to your observation of her? A. Yes, sir.

"Q. Along with your first examination, did you conduct any laboratory tests for the presence or absence of male spermatozoon? A. I did a simple slide test, direct examination by miscroscope for the presence of male spermatozoon in the vaginal cavity, and that examination I performed showed that it was present.

"Q. It did show the presence of spermatozoa? A. It did.

"Q. What was the condition of this woman insofar as her mental or emotional state was concerned at the time you saw her? A. I would say she was in border-line hysteria, hardly able to communicate. She seemed extremely distraught.

"Q. As a result of that emotional or mental strain, did you give her any medicine? A. I gave her a very mild sedative."

William M. Jones testified that he was a criminal investigator for the 31st C.I.D., Fort Sill, and was one of the officers who investigated the rape of Mrs. Wanda Kuykendall. That later in the day that the rape occurred they took a number of men to the hospital room where Mrs. Kuykendall was confined and had her view them one at a time, and she failed to make an identification. Later a large number of men, he did not remember the exact number, were taken to the Lawton City Police Station, and she again failed to identify her attacker. He stated that she gave him a description of the man; that altogether he would say she viewed in the vicinity of twenty men; that he submitted many photographs to her and she did not identify the man who had raped her, but so far as he knew there was no photograph of Mack Hutchinson at that time. Witness was present at the C.I.D. office in Fort Sill when Mrs. Kuykendall identified Mack Hutchinson as being the one who raped her. He stated that a group of five men, including the defendant, were placed in a room, and each given a large number on cardboard. That the room had an observation window to another room, and Mrs. Kuykendall was in the other room. That she picked the man by number and identified Hutchinson. He further stated that he talked with the defendant, and had him say, "Don't do nothing" as the rapist had said, and when he said these words Mrs. Kuykendall broke into hysterics.

This closed the case for the State, and counsel for defendant interposed a demurrer, which was overruled.

The defendant Mack Hutchinson testified and said that he had been in the Army three years, was then serving with the 163rd Truck Transporation; said that he wore a mustache on 29 May, 1953 and had worn one since he was sixteen, that C.I.D.

officer Hubert, a colored officer, took his statement concerning the crime with which he was charged. Witness stated that on May 28, 1953 after duty hours and around 5:30 or 6 o'clock he and four other colored soldiers drove from Fort Sill to Lawton, about a fifteen minute drive; that Wilson was driving; that they drove to the Blue Heaven Cafe next to a barber shop and one of the men got a hair cut; that they then drove to the Casalina Cafe, met some girls, then drove to Lawton View and then back to the Casalina; they left Rogers and drove to Fort Sill and then back to Lawton, and drove Jackson and a girl somewhere down on B Street; that then defendant, Wilson and Carmel went to Briggs and ate and Wilson picked up a girl and they drove to another house where a girl was; that they came back to No. 11 Bell Street around midnight and Carmel and defendant stayed there and Wilson drove on; that he had intercourse with a colored girl by the name of Vernice Mason and went back to the Casalina looking for Rogers and Jackson and they were not there so he and Carmel returned to Frank's Place and found the other boys at Frank's Place, and they all then drove to Lawton View where the officers picked them up. Defendant said he argued with the officers about his rights and it seems that he pushed back at an officer and was hit in the mouth. Defendant denied that he raped the prosecutrix, and said that he had told the C.I.D. that from the start.

On cross-examination defendant said that the car that was driven by Wilson and in which he and four companions were transported was a black Buick. He claimed that he was never separated from Carmel except for going in the room with the Mason woman at 11 Bell Street. He said that he had on a pair of Khaki pants and a blue shirt. He stated that the prosecutrix failed to identify him as her attacker when he was taken to the hospital with his companions the morning of May 29, 1953 and failed to identify him later at the police station, but that she did claim to identify him at the C.I.D. show-up; that the C.I.D. officers had him say certain words.

Defendant's companions Carmel, Wilson and Jackson testified for him and outlined their movements the night of May 28 and morning of May 29, 1953, substantially as did the defendant. The colored girl, Vernice Mason, testified and admitted intimacy with defendant a little after 12 A.M. May 29, 1953 and thought defendant and Carmel were at her place from 12 to about 2 A.M.

On cross-examination of Carmel it was brought out that written statements had been taken by the C.I.D. officers following the rape of prosecutrix, and Carmel had stated that "During the time I was in the Casalina, which was about an hour or more, I did not know the whereabouts of Wilson and Hutchinson". Witness admitted his signature to the statement, but insisted that he and defendant were never separated except when defendant went in a room at 11 Bell Street with the colored girl Vernice Mason.

Witness Wilson on cross-examination admitted his signature to a statement given C.I.D. Officer Hubert, the colored officer in which it was stated:

"Jackson, Rogers, Carmel and I left the Casalina in the automobile. I was driving. We went to Frank's Coffee Shop where we stayed for about ten or fifteen minutes. At about 0310 or 0315 that day Jackson, Carmel, Rogers and I left Frank's. I was driving. I drove to C Street and First Street where I stopped directly in front of the Casalina Coffee Shop, when I saw Hutchinson standing on the corner of C Street and First Street across from the Casalina Coffee Shop near the bus parking lot. Hutchinson come and got into the car. I did not see a woman with Hutchinson when he was standing on the corner. Soon about the time Hutchinson got into the car, an unidentified cab passed. I asked if any joints were open in Lawton View, he told me it was. I then turned right on C Street, drove west on 2nd Street, turned left on Second Street, and proceeded to Lawton View where we were later picked up in Lawton View.

"Q. Wilson did you know where Hutchinson was during the time he was absent from the group? A. No.

"Q. In your estimation, how long was Hutchinson absent from the group? A. About 20 or 25 minutes."

This witness admitted that he gave Johnie Hubert, the colored officer, the statement, but insisted that it was not correct.

On rebuttal Johnie Hubert testified that he was an army C.I.D. investigator and that he questioned the defendant Hutchinson and other soldiers who were arrested with Hutchinson on the morning of May 29, 1953 concerning their whereabouts and knowledge of the rape of Wanda Kuykendall, and that he subsequently took written statements from the parties. Witness was particularly asked concerning the statement that he took from Joseph Carmel and the one from Jesse Wilson, Jr. He said the statements were voluntarily made and without compulsion of any kind; that he wrote down the information in long hand as given him and the respective parties then signed. He was asked: "I direct your attention to that portion of Wilson's statement on page 3 it says: 'When I saw Hutchinson standing on the corner of C Street and First Street across from the Casalina Coffee Shop'. Do you have any independent recollection of him making that statement to you, and your writing that statement down at that time? * * * A. I remember him making that statement, sir." C.I.D. agent Jones also testified that he was present when Hubert took the statements and he said the statements as read at the trial were exactly as given by the parties to agent Hubert. The written statements were admitted in evidence.

Considering the testimony recited it is at once clear that the prosecutrix was without doubt raped some time about midnight May 28, 1953, or the early morning of May 29. This fact is corroborated by the examining physician, Dr. Richard B. Hunter. That she screamed is corroborated by Reatha Blackmon, and that defendant was seen with prosecutrix seconds after was also corroborated by the same witness, as well as the colored soldier, Herman Jones,

though he tried to weaken the positive testimony given at the preliminary and the written statement that he made. That she was at the corner of First and C Streets across from the Casalina Coffee Shop with a baby in her arms and with a colored man a few feet behind and between 2:30 and 3 o'clock in the morning was positively testified to by the Yellow Cab driver, Delbert Ritter as well as by Reatha Blackmon. Ritter observed that the car was a black Buick and by use of his wireless telephone in his car caused the police to pick up the occupants of that car in a matter of minutes and the defendant was one of the men in the car. So, in addition to this witness and Reatha Blackmon, the driver of the Buick had told C.I.D. officer Hubert, according to the testimony of Hubert and officer Jones, that he did pick Hutchinson up on the corner of First and C Streets across from the Casalina.

All these facts more than off-set the fact of the difficulty the prosecutrix had in immediately identifying the defendant. By reason of her ordeal, mental strain, and the sedative, her lethargy and slowness in getting her wits together a few hours after her ravishment, or even immediately after discharge from the hospital would seem not material. At the time she was called to the Army C.I.D. officer her mental strain no doubt had lessened. Then, too, she could see the five men as they paraded past and unobserved by them. Some of the commands made by her assailant at the time of the attack were repeated and the voice of the defendant, together with his build, his mustache, which is not usual with colored men, satisfied her; and in fact she became hysterical on the recognition of the voice. It was apparently dark in her little back-alley apartment when she was ravished, and her best opportunity to view her assailant was under the street lights. Her description of the dress of the man breaking into her apartment, and the man seen with her was corroborated by all witnesses. And defendant on arrest minutes after the attack was dressed as had been described by the prosecutrix.

Although counsel concede that there is nothing in the record except the mere al-

legation in the motion for new trial to support their further complaint of error, and involving alleged improper remarks of the county attorney in his closing address to the jury, it is insisted that the proposition should be given consideration.

One of the grounds in the motion for new trial is: "Improper closing argument by county attorney wherein he excited the jury to passion and prejudice by referring to the defendant as a 'snorting black beast', and further referred to said defendant as a 'horrible black monster' ".

■ Nowhere in the record does it appear that objections or exceptions were taken to the alleged improper remarks of the county attorney. We cannot be certain that he made the remarks, attributed ex parte. From the vigour and alertness displayed by counsel in the case as reported, we must assume that any remarks by the county attorney not supported or justified by the evidence, would have immediately been objected to and a record preserved. In Secondi v. State, 94 Okl.Cr. 381, 236 P.2d 507, 509 we said: "When not in the record, such remarks cannot be shown by affidavit or mere recital in the motion for new trial". See also Griffin v. State, 79 Okl.Cr. 85, 151 P.2d 812, and the cases cited in those two cases.

If the jury had assessed the death penalty in this case, under authority of Henderson v. State, supra, we would have given serious consideration to a modification, but here there is no indication that the alleged remarks of the county attorney caused an assessment of excessive punishment.

The vital question at issue (the ravishment being established without any contradiction) was whether the ravisher was in fact the defendant. The identity of the defendant was promptly established by the testimony of Reatha Blackmon, Herman Jones and Delbert Ritter, which corroborated the statement of the prosecutrix as to description of her assailant and her route of travel with him on the Lawton streets following the attack, and showed defendant to be the person walking with her up to First and C Streets on the corner across from the Casalina Coffee Shop. And the written statements of Joseph Carmel, although contradictory to his testimony at trial, showed that the time element, when defendant was out of his presence, afforded opportunity, and the written statement given by Joseph Wilson, the driver of the black Buick as to the point where he picked up the defendant corroborated the statement of the prosecutrix and Reatha Blackmon and Delbert Ritter. This, as heretofore indicated, offsets the slowness of the actual identification by the prosecutrix, but apparently that very slowness enabled the defendant to escape more severe punishment. For the crime itself was most heinously perpetrated, and was brutal and demonstrated a depraved mind and licentious appetite. And from the remarks allegedly made to prosecutrix that caused her to open the main door to her humble back-alley apartment located on the fringe of the colored district would indicate that her attacker knew that her husband was in the army and that he was on duty that very night; that she was a young and inexperienced person of a foreign ancestry and without acquaintance. Indications are that she had been observed previously, and the liquor shown to have been consumed by her attacker removed all inhibitions and spurred into action depraved instincts. His previous relations with the colored prostitute had only whetted his appetite. The conduct in truth was most brutal and bestial regardless of whom the perpetrator might be. This defenseless young mother not yet healed from the ordeal of her first born, fought to the last for her virtue, but was overcome and humiliated and debauched and her mind no doubt seared and irreparably scarred by the nightmarish ordeal to which she was subjected. And while the laudable phrase "Dignity of Man" that causes concern world wide by Christian people and God fearing people, and albeit by those without so pure motive, may be said to be a generic term, all inclusive, yet it is meaningless and becomes trite unless justified by a basic morality that respects womanhood and the right of womankind, regardless of race, creed or color, to the protection of her body, the very citadel of God-given life to man, from the seducer,

the rapist and sex maniac. The standards of civilized society must be higher than the standards of the jungle.

The evidence was ample to sustain the fact question decided by the jury and there is nothing in the record that would justify this court in interfering with the verdict and judgment rendered.

The case must be and is affirmed.

JONES and BRETT, JJ., concur.